United States Court of Appeals,

Fifth Circuit.

No. 93-1894.

In the Matter of Charles Simpson CHRISTOPHER, Debtor.

SEQUA CORPORATION, et al., Appellants,

v.

Charles Simpson CHRISTOPHER, Appellee.

Aug. 15, 1994.

Appeal from the United States District Court for the Northern District of Texas.

Before KING and SMITH, Circuit Judges, and KAZEN,[*] District Judge.

KING, Circuit Judge:

Charles Simpson Christopher was sued by Sequa Corporation and Chromalloy American Corporation in New York state court in early 1989. At the time the suit was filed, the plaintiffs had actual knowledge that Christopher had earlier filed for Chapter 11 bankruptcy. His plan of reorganization was confirmed in August 1989. Christopher later brought an adversary proceeding against Sequa Corporation and Chromalloy American Corporation, and the bankruptcy court held that those parties' claims against Christopher had been discharged upon confirmation of Christopher's plan of reorganization. Sequa Corporation and Chromalloy American Corporation now appeal, arguing principally that their claims against Christopher, which accrued postpetition, cannot be discharged consistently with the requirements of the Due Process

---

[*]District Judge of the Southern District of Texas, sitting by designation.

1

Clause because they received inadequate notice of Christopher's bankruptcy proceedings.

I. BACKGROUND

A. FACTS

Charles Simpson Christopher filed for reorganization under Chapter 11 of the United States Bankruptcy Code in September 1987. After Christopher filed his petition, but prior to confirmation of his plan of reorganization, he joined a group of investors known as Resolute Holdings, Inc. ("RHI"). This investment group was in the business of acquiring insurance companies. Among the companies that RHI was interested in acquiring were Chromalloy American Insurance Group, Inc. and its insurance subsidiaries (collectively "CAIGI").[1] It appears that CAIGI was owned by Sequa Corporation ("Sequa"). The acquisition of CAIGI by RHI was effectuated on May 15, 1988. Sequa concedes that, during the course of the negotiations concerning CAIGI, Sequa was "made aware" that Christopher had at some prior date petitioned for bankruptcy relief under Chapter 11.

RHI's dealings quickly spawned litigation, including a lawsuit filed by Sequa in New York state court against RHI, Christopher, and other entities in 1989. According to Sequa's pleadings in that lawsuit, the following sequence of events took place. The Commissioner of the Rhode Island Department of Business Regulation and Insurance ("the Commissioner") issued a Conditional Order on

---

[1]According to Sequa, CAIGI later changed its name to American Universal Insurance Group.

May 27, 1988, approving RHI's acquisition of CAIGI on certain conditions. Sequa received $7,000,000 from RHI on July 15, 1988; unbeknownst to Sequa, however, RHI had violated the Commissioner's Conditional Order by extracting the $7,000,000 from certain of the subsidiary insurance companies within CAIGI. In September 1988, the Commissioner was appointed temporary receiver of those same CAIGI companies, and in a series of meetings soon thereafter the Commissioner threatened to void the transaction and force the parties to unwind the deal unless Sequa immediately restored the $7,000,000 to the source companies. Sequa complied and returned the money. Sequa and its wholly-owned subsidiary Chromalloy American Corporation (collectively, the "Sequa Group" or the "Group") then filed the lawsuit in New York against RHI, Christopher, and related entities and persons; the record contains an amended complaint from that lawsuit dated January 18, 1989, which includes counts for breach of contract, unjust enrichment, tortious interference with contractual relations, and fraudulent misrepresentation.

Christopher's reorganization plan was confirmed on August 24, 1989, in the midst of the New York litigation instigated by the Sequa Group. Because the claims of Sequa and Chromalloy American Corporation arose after commencement of Christopher's bankruptcy case, neither entity was listed or required to be listed as a creditor in Christopher's bankruptcy proceedings, and they never filed any papers or otherwise participated in those proceedings.

B. PROCEDURAL HISTORY

3

On July 24, 1991, Christopher filed an adversary proceeding in the United States Bankruptcy Court for the Northern District of Texas seeking a declaratory judgment that certain claims against him had been discharged by the confirmation of his plan of reorganization. Those claims included the claims that the Sequa Group was pursuing in its New York litigation, as well as numerous other claims against Christopher by other parties not now before this court. On September 23, 1992, the bankruptcy court presided over trial on the merits of Christopher's complaint and the Group's defenses. The bankruptcy court held that the Group's claims had been discharged. *Christopher v. American Universal Ins. Group, Inc. (In re Christopher),* 148 B.R. 832 (Bankr.N.D.Tex.1992). The Group appealed to the district court, which affirmed the bankruptcy court's judgment without additional findings of fact or conclusions of law. This appeal ensued.

### C. ISSUES

The Sequa Group raises several arguments for reversal. It contends that the discharge of its claims against Christopher was erroneous because (1) the discharge of its claims would violate due process as a result of the insufficient notice it received, (2) Christopher suffers from "unclean hands," (3) Christopher should have been equitably estopped from claiming discharge, and (4) Christopher waived his right to claim discharge.

### II. STANDARD OF REVIEW

This court reviews findings of facts by the bankruptcy court under the clearly erroneous standard and decides issues of law de

4

novo. *Henderson v. Belknap (In re Henderson),* 18 F.3d 1305, 1307 (5th Cir.1994); *Haber Oil Co. v. Swinehart (In re Haber Oil Co.),* 12 F.3d 426, 434 (5th Cir.1994). A finding of fact is clearly erroneous when, although there is enough evidence to support it, the reviewing court is left with a firm and definite conviction that a mistake has been committed. *United States v. United States Gypsum Co.,* 333 U.S. 364, 395, 68 S.Ct. 525, 541-42, 92 L.Ed. 746 (1948); *In re Henderson,* 18 F.3d at 1307. If the lower court's account of the evidence is plausible in light of the record viewed in its entirety, the court of appeals may not reverse it even though convinced that, had it been sitting as the trier of fact, it would have weighed the evidence differently. *Anderson v. City of Bessemer City,* 470 U.S. 564, 573-74, 105 S.Ct. 1504, 1511-12, 84 L.Ed.2d 518 (1985).

### III. ANALYSIS

#### A. DUE PROCESS

The Sequa Group's first due process argument is that the bankruptcy court erred in discharging its postpetition claims against Christopher because the Group was not given formal notice of the bankruptcy proceedings involving Christopher. In the alternative, the Sequa Group argues that, even if it was not entitled to formal notice, the actual notice of the bankruptcy proceedings received by the Group was insufficient to satisfy due process and so the confirmed plan cannot be res judicata as to the Group. We address the Group's second argument first, after a brief review of the law of bankruptcy applicable to the instant case.

## 1. *Legal Background*

Christopher received a discharge of indebtedness under Chapter 11 of the Bankruptcy Code, 11 U.S.C. § 1141(d). This discharge is broader than that obtained in a Chapter 7 bankruptcy; while a Chapter 7 discharge deals only with debts incurred prior to the filing of the petition, § 1141(d) discharges the debtor from any debt (with certain exceptions) that arose before the date of *confirmation.* 3 DAVID G. EPSTEIN ET AL., BANKRUPTCY § 10-30 (1992).

Under § 1141(d)(2), confirmation of a plan of reorganization does not discharge an individual debtor from any debt excepted from discharge under § 523 of the Code. The provision of § 523 that has been the focus of all attention in the instant case is § 523(a)(3), which excepts from the discharge of an individual debtor any debt

> (3) neither listed nor scheduled under section 521(1) of this title, with the name, if known to the debtor, of the creditor to whom such debt is owed, in time to permit—
>
> (A) if such debt is not of a kind specified in paragraph (2), (4) or (6) of this subsection, timely filing of a proof of claim, unless such creditor had notice or actual knowledge of the case in time for such timely filing;  or
>
> (B) if such debt is of a kind specified in paragraph (2), (4) or (6) of this subsection, timely filing of a proof of claim and timely request for a determination of dischargeability of such debt under one of such paragraphs, unless such creditor had notice or actual knowledge of the case in time for such timely filing and request[.]

The bankruptcy court relied on § 523(a)(3) in concluding that the Sequa Group's claims were discharged despite the Group's omission from the schedule of creditors because the Group had actual knowledge of Christopher's bankruptcy. It is not, however,

6

entirely clear that this is a correct reading of § 523; as the Group points out, § 523(a)(3) appears to be limited to debts owed to "creditors," which is a defined term including only prepetition claimants. 11 U.S.C. § 101(10). This is not critical to our decision in the instant case; even if § 523(a)(3) is wholly inapplicable to the Group's claims, § 1141(d) continues to mandate that those claims are discharged if they existed prior to the date of confirmation of the plan unless some other provision of § 523 applies to except those claims from discharge. The Group makes no argument based on § 523, premising its entire argument on due process.

The focus of the Group's due process argument is the Code's failure to require any specific form of notice of bankruptcy proceedings to persons holding claims that arise postpetition. All parties agree with the bankruptcy court's holding that nothing in the Bankruptcy Code or Bankruptcy Rules requires a Chapter 11 petitioner to serve notice of the Chapter 11 proceedings on parties with whom the petitioner deals postpetition. 148 B.R. at 835. Contrary to the Group's suggestion at oral argument, we concur with the bankruptcy judge's view that the lack of such a notice requirement in the Code was probably not the result of congressional oversight. The simple fact is that parties who deal with a bankrupt postpetition are frequently entitled to priority under §§ 503 and 507 of the Code, giving them an added level of protection as compared to the prepetition claimants. Additionally, the plan of reorganization cannot be confirmed under §

7

1129(a)(9)(A) unless the plan provides for the payment in cash and in full of persons holding "claims" for administrative expenses under §§ 503 and 507. Thus, persons holding claims against the debtor that arise postpetition are in some respects better able to protect their interests than are prepetition claimants. Although the Group makes some attempt to characterize itself as an administrative "creditor," it does not make any argument based on the plan's failure to treat it as such, nor does it seek to unravel the plan almost five years after confirmation. The Group seeks only to be allowed to proceed with its lawsuit against Christopher's postconfirmation assets—in other words, to avoid the discharge of its claims against Christopher arising between petition and confirmation.

## 2. *Actual Notice*

The Sequa Group argues that the bankruptcy court erred in determining that it received sufficient notice of Christopher's Chapter 11 bankruptcy proceeding to satisfy the requirements of due process. The general rule is that due process requires

> notice reasonably calculated, under all the circumstances, to apprise interested parties of the pendency of the action and afford them an opportunity to present their objections. The notice must be of such nature as reasonably to convey the required information, and it must afford a reasonable time for those interested to make their appearance.

*Mullane v. Central Hanover Bank & Trust Co.,* 339 U.S. 306, 314, 70 S.Ct. 652, 657, 94 L.Ed. 865 (1950) (citations omitted). The Court applied *Mullane* in the bankruptcy context in *Bank of Marin v. England,* 385 U.S. 99, 87 S.Ct. 274, 17 L.Ed.2d 197 (1966), and we recently did so in the case of *Grossie v. Sam (In re Sam),* 894 F.2d

8

778, 781 (5th Cir.1990). *See generally* 5 COLLIER ON BANKRUPTCY ¶ 1141.01[4][b] (Lawrence P. King ed., 15th ed. 1994); Nicholas A. Franke, *The Code and the Constitution: Fifth Amendment Limits on the Debtor's Discharge in Bankruptcy,* 17 PEPP.L.REV. 853 (1990).

We briefly recount the bankruptcy court's findings of fact indicating that the Sequa Group had actual notice of Christopher's ongoing bankruptcy proceedings when its claims arose. First, Christopher's bankruptcy was discussed at a meeting during early RHI-Sequa negotiations regarding the purchase of CAIGI by RHI, and the court found that the parties specifically discussed the propriety of Christopher's participation in RHI because of his bankruptcy. 148 B.R. at 834. The vice-president of Chromalloy American Insurance Group, Inc. also wrote a letter to RHI concerning the prospective purchase; the letter referred to the fact that Christopher's bankruptcy had been discussed with the Rhode Island Insurance Commissioner and requested RHI to amend its filings regarding its purchase offer to include formal disclosure of Christopher's bankruptcy. *Id.* In addition to the facts regarding notice cited by the bankruptcy court, Christopher directs our attention to a document in the record which is a letter from the Group's attorneys to the judge presiding over the New York lawsuit dated April 1989 in which Christopher's Chapter 11 bankruptcy is specifically referred to.

The Sequa Group does not challenge the bankruptcy court's factual findings, but contends only that the court erred in holding that the notice given to the Group was constitutionally adequate

9

under *Mullane.* The Group highlights the facts that it had no claims against Christopher at the time it received notice of Christopher's bankruptcy and that once the Group's claims arose, Christopher never notified the Group of important dates such as the deadline for filing objections to the plan of reorganization or the date of the hearing on confirmation of the plan.

The Group cites a number of cases in support of its position, beginning with *City of New York v. New York, New Haven & Hartford R.R.,* 344 U.S. 293, 73 S.Ct. 299, 97 L.Ed. 333 (1953), which was decided under the Bankruptcy Act of 1898. In that case, the City of New York owned liens on real estate owned by the railroad, and the railroad subsequently went through reorganization under § 77 of the Bankruptcy Act. *Id.* at 294, 73 S.Ct. at 300. The court set a deadline for the filing of claims, but only the railroad's mortgage trustees and creditors who had already appeared in court received notice of this order by mail. *Id.* Other creditors, such as the City of New York, were served by newspaper publication. *Id.* The Court considered whether the City's liens were discharged by the final decree in the reorganization and concluded that they were not because the judge who presided over the bankruptcy did not comply with § 77(c)(8) of the Bankruptcy Act, which required the judge to "cause reasonable notice of the period in which claims may be filed, ... by publication or otherwise." *Id.* at 296, 73 S.Ct. at 301. The Court held that publication was not "reasonable notice" to the City of New York under the circumstances of the case and that the City's knowledge of the reorganization did not impose a

10

duty of inquiry on the City in order to protect its rights. *Id.* at 296-97, 73 S.Ct. at 301. As the Court remarked, "even creditors who have knowledge of a reorganization have a right to assume that the statutory "reasonable notice' will be given them before their claims are forever barred." *Id.* at 297, 73 S.Ct. at 301.

Although *City of New York* is plainly similar to the instant case, it may be distinguished by the fact, which we observed in *In re Sam,* 894 F.2d at 781, that the Court apparently decided the case on statutory rather than constitutional grounds. *See In re Intaco Puerto Rico,* 494 F.2d 94 (1st Cir.1974) (applying *City of New York* to a similar case arising under Chapter X of the Bankruptcy Act as a matter of statutory interpretation); *In re Harbor Tank Storage Co.,* 385 F.2d 111 (3d Cir.1967) (same). The Tenth Circuit, however, has relied in part on *City of New York* in holding that a due process violation had occurred on facts similar to the instant case. In *Reliable Elec. Co. v. Olson Constr. Co.,* 726 F.2d 620, 621 (10th Cir.1984), a construction subcontractor ("Reliable") withdrew from a project and filed a petition under Chapter 11 shortly thereafter. The general contractor ("Olson") was told in a telephone conversation with Reliable's attorney that the reorganization proceedings had been instituted, but he received no further information about the bankruptcy proceedings. *Id.* Reliable then sued Olson in state court, and Olson removed to federal bankruptcy court and counterclaimed against Reliable. *Id.* Olson ultimately prevailed on both Reliable's claim and its own claim, but not until after Reliable's plan was confirmed. The

bankruptcy court denied Reliable's motion requesting the court to find that Olson's claim had been discharged when the plan was confirmed. *Id.* at 621-22. The Tenth Circuit affirmed, holding that "the discharge of a [prepetition] claim without reasonable notice of the confirmation hearing is violative of the fifth amendment to the United States Constitution." *Id.* at 623.

The Tenth Circuit extended its holding in *Reliable Elec. Co.* to cases involving creditors whose claims arise postpetition in *Dalton Dev. Project #1 v. Unsecured Creditors Comm. (In re Unioil),* 948 F.2d 678 (10th Cir.1991). In that case, the debtor engaged in unauthorized postpetition transfers of interests in some oil and gas properties to several partnerships, including Dalton Development Project # 1 ("Dalton"). *Id.* at 679-80. The transfers were not discovered until two years after the plan of reorganization was confirmed, and the bankruptcy court granted the motion of the creditors committee to set aside the transfers. *Id.* at 680. The court also held that any claim against the debtor held by Dalton was barred by the confirmation of the reorganization plan. *Id.* at 681. The Tenth Circuit reversed this holding, concluding that *Reliable Elec. Co.* places the burden on the debtor to provide formal notice of the confirmation hearing to a known creditor if that creditor's claims are to be discharged in bankruptcy. *Id.* at 683.

We have concluded that it does not offend due process to view actual notice of a debtor's bankruptcy to a prepetition creditor as placing a burden on the creditor to come forward with his claim.

12

In *In re Sam,* we considered a case in which the claimant filed a §
1983 lawsuit against a police officer several months after the
officer had filed for bankruptcy. *In re Sam,* 894 F.2d at 778. The
claimant was not listed as a creditor, and the first time he heard
of the debtor's bankruptcy was eighteen days before the deadline
for filing claims in the bankruptcy court, when the claimant's
attorney received a notice of the automatic stay identifying the
bankruptcy court, case number, and the names of the debtor and his
attorney. *Id.* at 778-79. Although the claimant did not receive
notice of the actual bar date until after it had passed, we
affirmed the lower courts' holdings that the claim was time-barred.
*Id.* Rejecting the claimant's due process argument, we stated that
when the claimant received the notice of the automatic stay "he was
on notice that his section 1983 claim against Sam was affected by
Sam's bankruptcy, and he had eighteen days to inquire as to the bar
date and file his complaint or a motion to extend the bar date."
*Id.* at 781. "[B]ecause that notice apprised him of the pendency of
the action and was timely enough to afford him an opportunity to
present his objections, it satisfies constitutional procedural due
process requirements." *Id.* at 782.

The Sequa Group argues that *In re Sam* is distinguishable from
the instant case and that dicta in *In re Sam* actually supports the
Group's position. As we have already noted, the *In re Sam* court
did not find *City of New York* controlling because that case
"apparently was decided on statutory rather than constitutional
grounds." *Id.* at 781. The *In re Sam* court went on, as the Group

13

points out, to distinguish *City of New York* on the facts; the *In re Sam* court opined that the Court in *City of New York* required that creditors receive actual notice of the specific bar date because under the Bankruptcy Act the setting of this date was discretionary with the judge. Under modern Bankruptcy Rule 4007(c), the *In re Sam* court observed, the bar date is established as sixty days from the first date set for a meeting of creditors under § 341(a). *Id.* at 781. The Sequa Group argues that the *In re Sam* court thus implicitly recognized that actual notice of bankruptcy proceedings in general is not constitutionally sufficient if the pertinent date is one that is set at the discretion of the debtor or the court, such as the date of the hearing on confirmation of the plan of reorganization.

Although the court's opinion in *In re Sam* does contain dicta that arguably support the Sequa Group's position, it is the holding of the case upon which we must focus our attention. The precise question in that case was whether the notice received by the claimant—a notice of automatic stay, received eighteen days before the bar date, that did not even recite the bar date—was sufficient to satisfy due process. We concluded that it was constitutionally sufficient for two reasons: (1) the notice apprised the claimant of the pendency of the action, and (2) it was sufficiently timely to permit the claimant to present his objections. *Id.* at 782. This seems to us to be consistent with language in *Bank of Marin,* in which the Court considered whether a trustee in bankruptcy could hold a bank liable for honoring checks drawn by a depositor before

14

the depositor filed for bankruptcy but presented for payment after the filing for bankruptcy if the bank had no notice of the filing. *Bank of Marin,* 385 U.S. at 100, 87 S.Ct. at 275-76. The Court concluded that the bank could not be held liable consistently with due process, and stated that "[t]he kind of notice required is one "reasonably calculated, under all the circumstances, to apprise the interested parties of the pendency of the action.' " *Id.* at 102, 87 S.Ct. at 277 (quoting *Mullane,* 339 U.S. at 314, 70 S.Ct. at 657).

The *In re Sam* analysis is also consistent with that used by the Eleventh Circuit in *Alton v. Byrd (In re Alton),* 837 F.2d 457 (11th Cir.1988) (per curiam). In that case, Alton filed under Chapter 11 after Byrd had filed suit against Alton in federal court. *Id.* at 458. Although Byrd was never listed as a creditor in the bankruptcy proceedings, Byrd's counsel did promptly receive a copy of the notice of Alton's Chapter 11 proceeding and automatic stay. *Id.* The notice did not indicate the date of the Chapter 11 filing or the date set for the creditors' meeting, *id.;* nevertheless, the court held that due process was not offended by the bankruptcy court's denial of Byrd's late-filed application to extend time to file a complaint with the bankruptcy court, *id.* at 460. As the court succinctly stated, "[a]t a time when he could have protected himself, creditor Byrd received actual written notice of the bankruptcy proceeding, a notice adequate "to apprise [him] of the pendency of the action and afford [him] an opportunity to present [his] objections.' " *Id.* at 460-61 (quoting *Mullane,*

399 U.S. at 314, 70 S.Ct. at 2142-43).

From the foregoing, we conclude that the first prong of the due process analysis from *In re Sam*—notice apprising the claimant of the pendency of the action affecting his rights—has been satisfied in the instant case. Proceeding to the second prong of the analysis, which is whether the notice was sufficiently timely, we conclude that this question must also be answered in the affirmative. As we have seen, the Group had notice of Christopher's bankruptcy even before its claims against Christopher arose. As we have already explained in part III.A.1, *supra*, claimants whose claims arise postpetition are amply protected by several features of the Bankruptcy Code. As even the Group recognizes, a strict requirement of formal notice to all postpetition claimants could be extremely onerous, especially for large debtors. Thus, given the actual notice of Christopher's bankruptcy proceeding possessed by the Group, we conclude that due process is not offended in this case by requiring postpetition claimants in the Group's position to come forward and protect their enhanced rights under the Code or else lose their rights through the sweeping discharge of Chapter 11. This is not a case like *Pettibone Corp. v. Payne (In re Pettibone Corp.),* 151 B.R. 166 (Bankr.N.D.Ill.1993), in which a Chapter 11 petitioner tortiously injures someone just prior to plan confirmation and the tort victim does not learn of the bankruptcy until after confirmation, and we accordingly express no opinion regarding the requirements of due process in such a case.

In sum, we conclude that the actual notice of Christopher's bankruptcy possessed by the Sequa Group was sufficient to satisfy the dictates of due process and *Mullane.* We decline the Group's invitation to use the Due Process Clause to fill what appears to us to be an intentional and generally unproblematic gap in the Code's notice provisions.

### 3. *Formal Notice*

This argument need not detain us in light of the foregoing. The Sequa Group contends that due process entitled it to formal notice of the date of the hearing on confirmation of Christopher's plan of reorganization. We have already seen that due process requires only notice that is both adequate to apprise a party of the pendency of an action affecting its rights and timely enough to allow the party to present its objections. *In re Sam,* 894 F.2d at 782. In *In re Sam* we held that notice of an automatic stay eighteen days before a deadline for filing claims was sufficient notice to satisfy due process even though the notice of the stay did not indicate the deadline date. *Id.* at 781-82. Formal notice of the deadline was not required in *In re Sam;* neither was formal notice of Christopher's confirmation hearing required by the Due Process Clause in the instant case.

### B. EQUITABLE ARGUMENTS

The Sequa Group next presents three arguments premised on the equitable concepts of unclean hands, equitable estoppel, and waiver.

### 1. *Unclean Hands*

In the Group's view, "[t]here is scarcely a debtor less worthy of the equitable discharge than Christopher."  The Group contends that Christopher cannot take advantage of the equitable remedy of discharge because he suffers from unclean hands for the following reasons:  (1) Christopher failed to serve the Group with notice of any proceedings in his bankruptcy case;  (2) Christopher deliberately concealed the Group's claims against him from the bankruptcy court and his creditors;  (3) Christopher failed to mention in the New York litigation with the Sequa Group that the confirmation of his plan of reorganization would discharge the Group's claims against him;  (4) Christopher actively defended the New York litigation while secretly seeking discharge of the Group's claims;  and (5) Christopher retained counsel in the New York litigation without prior bankruptcy court approval.  The bankruptcy court rejected this argument, observing that nothing in the Bankruptcy Code or Rules requires a debtor-in-possession to serve notice of Chapter 11 proceedings upon parties with whom it deals postpetition and that the Sequa Group had actual knowledge of Christopher's bankruptcy and was on notice of the ramifications of nonparticipation.  148 B.R. at 836.

The Group relies in part on dicta in *Doucette v. Pannell (In re Pannell),* 136 B.R. 430 (N.D.Tex.), *aff'd,* 974 F.2d 172 (5th Cir.1992) (unpublished opinion).  In that case, Doucette was pursuing fraud claims in state court against the debtor, Pannell, at the same time Pannell was going through Chapter 11 bankruptcy. *Id.* at 432-33.  Although Doucette somehow had notice of the Chapter

18

11 proceedings, *id.* at 432 n. 2, Doucette did *not* receive notice when Pannell's case was converted to a Chapter 7 bankruptcy, nor did Doucette receive notice of the new bar dates for filing claims and dischargeability complaints then established, *id.* at 433. Doucette obtained a judgment against Pannell in the state court after the bar dates had passed and filed a late proof of claim and complaint for exception to discharge in the bankruptcy court, both of which the bankruptcy court dismissed for lateness. *Id.* The district court reversed the bankruptcy court on statutory grounds, holding that Doucette did not have "notice or actual knowledge," 11 U.S.C. § 523(a)(3)(B), of the relevant case—the Chapter 7 case—in time to take appropriate action. *In re Pannell,* 136 B.R. at 436. The Sequa Group places great stock on the court's remark that "[t]here could hardly be a more blatant case of a debtor abusing the judicial system in an attempt to defraud a creditor," *id.* at 437, but this dictum does not warrant reversal in the instant case, in which the Group had actual knowledge of the debtor's Chapter 11 bankruptcy long before the Group's claim even arose.

The Sequa Group also attempts to rely on cases from various bankruptcy courts discussing the fiduciary duties of a debtor-in-possession towards his creditors. *E.g., Whyte v. Williams (In re Williams),* 152 B.R. 123, 127 (Bankr.N.D.Tex.1992). None of the cases cited by the Group persuades us that the bankruptcy court erred in concluding on these facts that Christopher did not have unclean hands. The Group had knowledge of Christopher's bankruptcy, and Christopher apparently violated no

19

statute or rule in failing to provide more information to the Group than he did. We find no error in the bankruptcy court's conclusion.

## 2. *Equitable Estoppel*

The Sequa Group next relies on the doctrine of equitable estoppel to prevent Christopher from asserting his Chapter 11 discharge against the Group's claims. Equitable estoppel requires (1) a material misrepresentation or concealment (2) made with actual or constructive knowledge of the true facts (3) with the intent that the misrepresentation or concealment be acted upon (4) by a third party without knowledge or means of knowledge of the true facts (5) who detrimentally relies or acts on the misrepresentation or concealment. *Neiman-Marcus Group, Inc. v. Dworkin,* 919 F.2d 368, 371 n. 4 (5th Cir.1990). The bankruptcy court rejected this argument because Christopher made no material misrepresentation or concealment regarding his bankruptcy proceeding. 148 B.R. at 837.

We reject the argument that Christopher "misrepresented" or "concealed" his bankruptcy case from the Group based on a theory that he had a duty to notify the group of such matters as the bar date for filing proofs of claims, the time for filing acceptances or rejections of the plan, or the hearing on confirmation of the plan. As the parties have agreed, the Bankruptcy Code and Rules impose no such duty on debtors with respect to parties dealt with postpetition. The Due Process Clause does impose certain notice obligations on debtors who file for bankruptcy, but we have already

20

concluded that those obligations were met in the instant case. The bankruptcy court did not clearly err in determining that Christopher was not guilty of any misrepresentation or concealment.

We thus conclude that the Group is not entitled to relief under the equitable estoppel doctrine.

### 3. *Waiver*

Finally the Sequa Group asserts that Christopher waived his right to claim discharge from any debt owed the Group on its claims. Waiver may be established by showing that a party actually intended to relinquish a known right or privilege. *HECI Exploration Co., Employees' Profit Sharing Plan v. Holloway (In re HECI Exploration Co.),* 862 F.2d 513, 523 (5th Cir.1988). The Group contends that Christopher's conduct in defending the New York state lawsuit for almost two years after confirmation of his plan of reorganization manifests his intent to relinquish his right to rely on his discharge in bankruptcy. The bankruptcy court concluded that Christopher's "litigation of the state court claims against him did not evidence an actual intent to relinquish [his] right to discharge of the state court claims." 148 B.R. at 837.

We do not agree with the Group's contention that the bankruptcy court clearly erred in finding that Christopher did not actually intend to relinquish his right to assert against the Group the discharge he received in his Chapter 11 proceedings. Christopher testified at trial that he actively defended the New York lawsuit even after receiving his discharge because his counsel advised him that the litigation of the Group's postpetition claims

21

was not affected by his Chapter 11 proceedings.  This testimony negates the inference that could be drawn from Christopher's conduct that he intended not to rely on his discharge in the Group's New York lawsuit.  Indeed, Christopher's testimony supports another inference that could be drawn from his conduct—that he simply did not know he could use his discharge as a defense in the New York lawsuit.  The bankruptcy court's finding that Christopher did not intend to relinquish a *known* right is plausible in light of the record viewed in its entirety and so is not reversible.

## IV. CONCLUSION

For the foregoing reasons, we AFFIRM the judgment of the district court.