**In re PARKWOOD REALTY COR-PORATION d/b/a Graystone Corporation, Debtor.**

**No. 92–00152.**

United States Bankruptcy Court,
W.D. Washington,
at Seattle.

Aug. 25, 1993.

G. Perrin Walker, Vandeberg & Johnson, Tacoma, WA, for Parkwood Lakes, Inc.

Timothy W. Dore, Ryan, Swanson & Cleveland, Seattle, WA, for debtor, Parkwood Realty Corp.

## MEMORANDUM OPINION

SAMUEL J. STEINER, Chief Judge.

This matter is before the Court on the motion of Parkwood Lakes, Inc., for an Order requiring the debtor to surrender, pursuant to the Parkwood Lakes Shareholders Agreement, all of its shares of Parkwood Lakes for $3,330, or alternatively for relief from the automatic stay for the purpose of pursuing its remedy in State Court.

## I. BACKGROUND

The debtor is a residential real estate company. Terry Gilmour, a licensed real estate agent, who is a Chapter 7 debtor in another case pending in this court, is the debtor's president and 100% shareholder. In the late 1980s, the debtor operated in four local locations, namely University Place, Spanaway, Lakewood, and Federal Way. In 1990–91, the debtor restructured its operations, so that it was left with just the University Place and Federal Way offices. The Lakewood office was merged with Century 21–Metro, an unrelated entity, to form Parkwood Lakes. The reorganized debtor is operating only the Federal Way office and retains its interest in Lakes stock, subject to resolution of the issues before the Court.

When Parkwood Lakes was formed, Lakes gave the debtor a $100,000 note. In its Statement of Affairs, the debtor identified the consideration for the note as being furniture, fixtures, equipment, and leasehold improvements. The note is to be paid solely from profits and is subordinated to all other Lakes debt. According to Lakes, it has never had any profits from which to make payments on the note.

The debtor and Century 21–Metro each contributed approximately $70,000 in capital. Of its $70,000 investment, the debtor has been repaid $60,000. The debtor alleges that Century 21–Metro never actually made its initial contribution, in that the $70,000 it purports to have contributed was used not to capitalize Parkwood Lakes but to complete its own independent operations before the merger. These matters remain the subject of a dispute between the parties.

Pursuant to the "Parkwood Lakes Shareholders Agreement" dated May 2, 1991, the debtor owned 33,330, shares of Parkwood Lakes stock, representing one-third of the total; and four other individuals each owned one-sixth of the remaining shares, for a total of 16,670 apiece. (One of the four was Brent Gilmour, Terry Gilmour's son.) Paragraph 4 of the Shareholders Agreement restricts the transfer of shares generally, and § 5 gives the corporation the right of first refusal to purchase the shares of a withdrawing stockholder, failing which the same right flows to the remaining shareholders. If the shareholders pass up the option, the shares may be sold to an outsider, subject to the Shareholders Agreement. Additionally, the corporation may compel the surrender of shares of any stockholder who terminates "active association in operation or management of the Corporation." In such event, the corporation must pay the departing shareholder "the then last agreed value per share" in installments. The "then last agreed value" is established in § 8 of the Agreement as $0.10 per share, subject to modification at any time "by a unanimous vote of all shareholders at any scheduled meeting of the shareholders."

In August, 1992, the board of directors paid two shareholders (including Brent Gilmour) $1,670 each for their shares, based on the cessation of their involvement in the company. According to Lakes, Terry Gilmour, on behalf of the debtor, had also ceased his active association with Lakes in October or November of 1991, although he continued to sell real estate for others. At a directors' meeting held August 3, 1992, the board, with Terry Gilmour dissenting, voted that the debtor's shares be deemed terminated, subject to the Court's approval.

On January 8, 1992, the debtor filed this Chapter 11 case. In its schedule of personal property, the debtor listed its stock in Parkwood Lakes as having a value of $50,-000. The account receivable from Parkwood Lakes was listed at a value of $125,-

000. Parkwood Lakes was not listed on the schedule of executory contracts. Parkwood Lakes was not listed as a creditor, nor has it appeared on the mailing matrix at any time during the case. Hence it did not receive notice of the claims April 1, 1992, bar date, or the hearing on the Disclosure Statement or Plan. In February, 1992, the debtor filed a motion to reject several executory contracts. The Parkwood Lakes Shareholders Agreement was not among them.

The debtor filed its Disclosure Statement and Plan on December 1, 1992. Under § VIII of the Plan, entitled "Executory Contracts and Unexpired Leases," the debtor expressly rejected two leases. The Parkwood Lakes Shareholders Agreement was not identified in this context, although the Plan provides for the rejection of unidentified contracts with the following boilerplate language:

> All other executory contracts or unexpired leases of Parkwood which have not been previously rejected shall be deemed rejected on the Effective Date.

The Disclosure Statement does contain references to Parkwood Lakes, noting that the board had purported to invoke the involuntary buy-out provision of the Shareholders Agreement. It was the debtor's position that the board's action violated the stay and was therefore void. In addition, the debtor's claim on the $100,000 note, as well as the debtor's ownership interest in Lakes are identified as "Disputed Claims", which are to provide a source of funding for the Plan in the event the debtor chooses to pursue them. To date, the debtor has not commenced litigation on any "Disputed Claims."

## II. RELIEF REQUESTED

Parkwood Lakes, Inc., has moved for an order requiring the debtor to sell to it all of its shares of Parkwood Lakes stock for $0.10 per share, pursuant to the Parkwood Lakes Shareholders Agreement, or alternatively, for relief from stay to pursue its remedy in State Court.

The debtor objects to the relief requested, asserting the following: 1) An adversary proceeding is required, in that Lakes is attempting to recover property. 2) The Shareholders Agreement is an executory contract, which was rejected upon confirmation of the debtor's plan on February 26, 1993. As a consequence, Lakes has only a general unsecured claim for breach. No proof of claim having been filed by the claims bar date, any debt to Lakes has been discharged. 3) The buy-out terms of the Shareholders Agreement are ambiguous, and appear to require a professional valuation of the stock to determine the purchase price. 4) The board's action in deeming the debtor's shares terminated violated the automatic stay and is therefor void.

The primary issues are whether the Shareholders Agreement is an executory contract, and if so, whether it was effectively rejected upon confirmation. The resolution of these issues will control the outcome of the others. Neither side thoroughly briefed these issues, notwithstanding the fact that they are technical and complex.

## III. DISCUSSION

### A. *Is the Shareholders Agreement an Executory Contract?*

Whether a contract is executory for purposes of the Bankruptcy Code is a question of federal law. *Campbell–Devon Productions, Inc., v. Qintex Entertainment, Inc.,* 950 F.2d 1492 (9th Cir.1991). The Ninth Circuit has adopted Professor Vern Countryman's analysis, under which an executory contract is defined as one containing " 'obligations of both parties that are so far unperformed that the failure of either party to complete performance would constitute a material breach and thus excuse the performance of the other.' " *In re Wegner,* 839 F.2d 533, 536 (9th Cir.1988), as quoted in *Campbell–Devon Productions v. Qintex, supra* at 1495.

While the Court has not been able to find any cases directly relating to stock repurchase agreements, those addressing real estate purchase options are pertinent. For the most part, the decisions treat pur-

chase options as executory contracts. *In re A.J. Lane & Co., Inc.*, 107 B.R. 435 (Bankr.D.Mass.1989); *Steffan v. McMillan (In re Coordinated Financial Planning Corp.)*, 65 B.R. 711 (Bankr. 9th Cir.1986). As noted by the court in *A.J. Lane & Co.*:

> ... [A]n option has unusual characteristics. It is a unilateral contract until exercised; upon exercise, it becomes a bilateral contract. W. Jaeger, *Williston on Contracts* § 61B (3rd ed. 1963). It is the contingency of exercise which makes the option executory for our purposes. Upon exercise, substantial performance remains on both sides—conveyance of the property by the Debtor and payment of the purchase price by [the other party]. A material breach would occur should either party refuse to complete the transaction after exercise.

*Id.* at 437.

The *A.J. Lane* analysis applies directly to the case at bar. Thus at the very least, upon Parkwood Lakes' decision to exercise its repurchase rights under the Shareholders Agreement, the debtor is required to turn over its stock, and Lakes is required to pay the purchase price. The debtor has raised an issue as to whether additional performance is required by Lakes, that is to obtain a professional valuation of the stock for purposes of establishing the price. Even without deciding that issue, the performance required on each side is sufficiently substantial that nonperformance on the part of one would excuse performance of the other. Accordingly the Court concludes that the agreement at issue is an executory contract.

### B. *Was the Shareholders Agreement Rejected During the Debtor's Chapter 11 Case?*

The treatment of executory contracts in bankruptcy is governed by 11 U.S.C. § 365. Section 365(a) authorizes the trustee or a debtor in possession, "subject to the court's approval," to assume or reject any executory contract of the debtor. Section 1123(b)(2) states that a plan may, "**subject to section 365** ..., provide for the assumption, rejection, or assignment of any executory contract ... of the debtor not previously rejected under such section...." Thus while § 1123(b)(2) permits rejection, it is not automatic. "... [I]f the contract is not affected by the plan, it rides through the proceedings having neither been assumed nor rejected and will thereafter be binding on the debtor. The discharge of section 1141(c) will not assist the debtor since, absent rejection, the other party to the contract will not be a creditor." 2 *Collier on Bankruptcy* (15th ed.) § 365.03, at 365–31. *Accord, Smith v. Hill*, 317 F.2d 539, 542 (9th Cir.1963).

▮ The issue here is whether the catch-all boilerplate language contained in the debtor's plan was effective to reject the Shareholders Agreement. In *In re Continental Country Club, Inc.*, 114 B.R. 763 (Bankr.M.D.Fla.1990), a Florida bankruptcy court was faced with a nearly identical situation. There, the debtor's president and CEO sought to enforce an executory employment agreement post-confirmation, where the agreement had not been rejected either by motion or specifically identified in the plan. The *Continental* case differs from this case only in the respect that the plan proponent was not the debtor. Having ruled previously that only the debtor had standing to assume or reject executory contracts, the plan proponent was not allowed to deal with such contracts directly in the plan. Hence the debtor made the required motions while confirmation was held in abeyance. The plan contained boilerplate purporting to reject "[a]ll leases and executory contracts not listed in Schedule B, or assumed by Continental Country Club, Inc., prior to the entry of the Order confirming this plan." Since the court had already ruled that the plan proponent lacked standing to reject such contracts, it was almost a foregone conclusion that the boilerplate was ineffective.

As an additional basis for its decision, however, the court held that the boilerplate would not have been effective to reject the employment contract, even if the plan proponent had had the right to reject the contract directly. The court's reasoning in this regard has direct application to the case at bar. First, while § 1123(b)(2) states

that the plan may provide for the rejection of an executory contract, this rejection is specifically subject to § 365 and as such requires "actual consideration by the Court." 114 B.R. at 767. In most cases, the court will defer entirely to the debtor's business judgment when rejection is accomplished through a plan, unless an objection is raised. Yet to approve the rejection of an unidentified contract results in purely fictitious compliance with the Code.

Second, and perhaps more important, are the due process implications inherent in the debtor's position. Parkside Lakes has never had notice that the debtor viewed the Shareholders Agreement as an executory contract, much less that it was one of those being rejected. Further, Parkside Lakes did not have notice of the hearing on confirmation. Indeed the executory contract argument was only raised defensively, after confirmation, when it was too late to file a claim for damages. This is insufficient. *Continental Country Club, supra; In re Spring Valley Farms, Inc.,* 863 F.2d 832 (11th Cir.1989) (as a matter of basic due process, a creditor is entitled to actual notice of the bar date in a Chapter 11 case).

The due process argument is buttressed by § 1141(b)(1), which provides that the confirmation of a plan "discharges the debtor from any debt that arose before the date of such confirmation, and any debt of a kind specified in section 502(g)...." Section 502(g) involves claims arising from the rejection of executory contracts. These provisions read together clearly contemplate that a party to an executory contract will receive notice of rejection when it receives a copy of the Disclosure Statement and Plan, giving it a window in which to file a proof of claim for damages. A party which has not even had notice of the plan, let alone the debtor's intention to reject, is given no opportunity to file a claim. To hold that a claim has been discharged under these circumstances would clearly violate due process.

For these reasons, the Court concludes that the debtor's failure at any time to notify Parkwood Lakes that it was rejecting the Shareholders Agreement as an executory contract results in the contract not having been rejected, notwithstanding the boiler plate language of the Plan, and that the agreement has passed through and remains in full force and effect.

## IV. CONCLUSION

1. The Shareholders Agreement was an executory contract that was not rejected and hence remains binding on the parties.

2. Parkwood Lakes should be granted relief from stay to allow it to file an action for specific performance in State Court.

3. In view of the Court's rulings, the issue as to whether an adversary proceeding is required is moot.

4. Further, in view of the Court's ruling, the issue as to whether the action of Parkwood Lakes' board of directors was in violation of the automatic stay is also moot.

5. Any ambiguity in the Shareholders Agreement relating to the terms of the buy-out may be addressed in the action to enforce the Agreement.