221 B.R. 298 (1998)
In re VICTORY MARKETS, INC., Debtor.
CHARTER ASSET CORP. and Benderson Development Company, Inc., Creditors-Appellants,
v.
VICTORY MARKETS, INC. and Estate of William Morris, Creditor-Appellee.
BAP No. 97-50053.
United States Bankruptcy Appellate Panel of the Second Circuit.
Argued February 20, 1998.
Decided June 9, 1998.
*299 *300 Margaret Cangilos-Ruiz, Whiteman, Osterman & Hanna, Albany, NY, for Creditors-Appellants.
Robert K. Weiler, Green & Seifter, P.C., Syracuse, NY, for Creditor-Appellee.
Before LIFLAND, Chief Judge, and KRECHEVSKY and BUCKI, Bankruptcy Judges.

OPINION
BUCKI, Bankruptcy Judge.

BACKGROUND AND ARGUMENTS
Charter Asset Corp. and Benderson Development Company, Inc. ("Charter/Benderson"), have appealed an order of Chief Bankruptcy Judge Stephen D. Gerling, which declared that the debtor had rejected the lease of a store in the New Hartford Shopping Center. Although the parties have framed the issue in terms of the binding effect and application of an Order confirming a Chapter 11 plan of reorganization, the outcome is also determined by the limits of statutory authority to assume leases of nonresidential real property under section 365(d)(4) of the Bankruptcy Code. We address both issues.
Victory Markets, Inc., and five of its affiliates filed petitions for relief under Chapter 11 of the Bankruptcy Code on September 20, 1995.[1] Their cases having been substantively consolidated, these affiliated entities are collectively referred to herein as the debtor. Prior to the bankruptcy filing, the debtor had operated fifty-seven grocery stores in northern and central New York. Among these locations were premises which the debtor leased from William Morris ("William Morris" or "landlord") at the New Hartford Shopping Center. Seeking to preserve the opportunity to assign its various leases, the debtor filed a motion on November 20, 1995, to extend the sixty day time period which section 365(d)(4) of the Bankruptcy Code allows for the assumption of an unexpired lease of nonresidential real property.[2] By order dated December 15, 1995, the bankruptcy court extended the time to assume the New Hartford lease ("New Hartford lease" or "lease") to January 20, 1996. An order dated March 14, 1996, granted a further extension of this time to March 20, 1996.
Early in 1996, the debtor entered into an agreement with Charter Asset Corp. for the sale of four parcels of improved real estate and the assignment of the lease for premises *301 at the New Hartford Shopping Center. The contemplated consideration for this transaction was $9,400,000, of which $400,000 was allocated to the assignment of the New Hartford lease. The agreement was subject to several contingencies,[3] among which was bankruptcy court approval. In anticipation of a closing, the debtor obtained an order dated March 29, 1996 (the "March 29th Order"), which authorized the assumption and assignment of its lease with William Morris. Sometime thereafter, Charter Asset Corp. assigned to Benderson Development Company, Inc., its rights under the agreement with the debtor. Meanwhile, the debtor had filed a motion on March 20, 1996, to secure a further extension of the time to assume or reject executory contracts. Presumably wishing to avoid an unintended rejection of the New Hartford lease, the debtor specifically referenced that lease in an order dated May 10, 1996, which extended the assumption period to the date of confirmation.
While the closing of the sale and assignment agreement with Charter/ Benderson was pending, the debtor proceeded to propose a plan of reorganization. Essentially, the plan contemplated a liquidation of the debtor's assets. Of the fifty-seven grocery stores that the debtor had operated before bankruptcy, thirty-five would be sold to operators whom the debtor had previously employed. The debtor would also sell its interest in any of the other properties which might have value above the outstanding encumbrances. Among these properties were those that were scheduled for sale or assignment to Charter/Benderson. In the disclosure statement that it distributed to creditors with the plan, the debtor made note of this anticipated transaction. Then, at the hearing on confirmation, the debtor's financial adviser testified that the Charter/Benderson deal was to be the primary source of funds needed to pay administrative claims. Finding the plan to be feasible, Judge Gerling signed the Order of Confirmation on September 27, 1996. Although the debtor expected completion of the sale and assignment to Charter/Benderson, the closing had not occurred and the contingencies were not met as of confirmation.
The debtor's confirmed plan of reorganization states, in part VI, that "[a]ll executory contracts and unexpired leases of each of the Debtors not previously assumed and assigned are hereby specifically rejected, except for (i) the executory contracts and unexpired leases listed on Exhibit E which are to be assumed pursuant to the plan and (ii) any executory contracts and unexpired leases which are the subject of a motion to assume or assign pending before the bankruptcy court on the Confirmation Date." As of confirmation, the debtor had not exercised its authority to assume the New Hartford lease, the New Hartford lease was not listed on Exhibit E, and this lease was not the subject of any pending motion before the bankruptcy court. Nor did the debtor secure any order granting a further extension of the time to assume or reject to a date subsequent to the order of confirmation. Concluding that the lease was rejected pursuant to the plan, William Morris filed a proof of claim on October 25, 1996, for damages resulting from that rejection.
Notwithstanding the landlord's interpretation that the plan of reorganization had effected a rejection of the New Hartford lease, the debtor and Charter/Benderson continued to work for a closing of the purchase and sale agreement. Meanwhile, the Estate of William Morris[4] moved the bankruptcy court on February 13, 1997, for an order declaring that the lease had been rejected. While the bankruptcy judge was deliberating this matter, Charter/Benderson closed the transaction on somewhat different terms than were originally proposed. Paying a greater consideration, Charter/Benderson took title to four parcels and accepted an assignment of whatever rights the debtor might have *302 against the Estate of William Morris. Then, in a memorandum and order dated September 8, 1997, the bankruptcy court granted the landlord's motion, and ruled that the lease was indeed rejected. As the real party in interest with respect to the lease, Charter/Benderson now appeals that decision.
In its decision, the bankruptcy court determined that a confirmed plan of reorganization is a contract between the debtor and its creditors. Finding no ambiguity in its terms, the Court ruled that the debtor's plan had rejected the New Hartford lease. The bankruptcy court also found that its previous order had only authorized the debtor to assume the lease. Because the debtor had never exercised that authorization prior to confirmation, the bankruptcy court concluded that the plan operated to reject the lease.
Charter/Benderson argues that the bankruptcy court erred in its holding that the debtor's confirmed plan had rejected the New Hartford lease. Rather, Charter/Benderson would find ambiguity in language of the confirmation order, in contrary language of the disclosure statement, in the label given to an attached exhibit,[5] and from inconsistencies between rejection of the lease and plan feasibility. Charter/Benderson further contends that the March 29th Order survived confirmation, so as to preserve the right to assume and assign the New Hartford lease. Alternatively, Charter/Benderson urges a reformation of the plan to conform to what they believe to be the intent of the parties.

STANDARD OF REVIEW
On the appeal of an order of the Bankruptcy Court, this panel is to review any conclusions of law de novo, but may only reverse those findings of fact which are clearly erroneous. Fed. R. Bankr.P. 8013; In re Oszajca, 207 B.R. 41, 43 (2nd Cir.BAP 1997). Satisfied that the evidence fully supported the factual conclusions of the bankruptcy court and that the applicable law compels the outcome below, we would affirm the decision of the bankruptcy court.

DISCUSSION
Section 1107 of the Bankruptcy Code grants to a debtor in possession the powers of a trustee under 11 U.S.C. § 365. Subdivision (a) of this section establishes the general rule, that "the trustee, subject to the court's approval, may assume or reject any executory contract or unexpired lease of the debtor." This general provision does not speak to the debtor's failure either to assume or to reject a lease. Without rejection, therefore, an executory contract will normally continue in existence after the completion of a Chapter 11 proceeding. LAWRENCE P. KING, COLLIER ON BANKRUPTCY, ¶ 365.04[2][d], at 365-31 (15th Ed. rev.1997). The 1984 amendments to the Bankruptcy Code modified this general rule, however, with respect to the type of lease that is the subject of the present dispute. Section 365(d)(4) now provides, in relevant part, that
in a case under any chapter of this title, if the trustee does not assume or reject an unexpired lease of nonresidential real property under which the debtor is the lessee within 60 days after the date of the order for relief, or within such additional time as the court, for cause, within such 60-day period, fixes, then such lease is deemed rejected, and the trustee shall immediately surrender such nonresidential real property to the lessor.
In contrast to the general rule, therefore, a lease of nonresidential real property is deemed rejected unless it is assumed within the applicable time limitations. In the present instance, the bankruptcy judge set the confirmation hearing as the last date for assumption of the New Hartford lease. Unless the debtor had expressly assumed the lease as of that time, it is deemed rejected by operation of 11 U.S.C. § 365(d)(4). The issue, therefore, is whether a timely assumption can be found in the facts of this case. We agree with the decision of the bankruptcy court that it cannot.
*303 An assumption of the New Hartford lease occurred, if at all, either by reason of the plan of reorganization or by operation of the March 29th Order which authorized assumption and assignment of the New Hartford Lease. Let us turn first to an examination of the plan of reorganization.

INTERPRETATION OF REORGANIZATION PLAN
Section 1141(a) of the Bankruptcy Code establishes the general rule that "the provisions of a confirmed plan bind the debtor, any entity issuing securities under the plan, any entity acquiring property under the plan, and any creditor, equity security holder, or general partner in the debtor . . ." For this reason, a confirmed plan holds the status of a binding contract as between the debtor and its creditors. McFarland v. Leyh (In re Texas Gen. Petroleum Corp.), 52 F.3d 1330, 1335 (5th Cir.1995); In re Sugarhouse Realty, Inc., 192 B.R. 355, 362 (E.D.Pa.1996). As with any contract, the starting point for review of a plan is its plain language. See McFarland v. Leyh, 52 F.3d at 1335; Sugarhouse, 192 B.R. at 363. Unless some ambiguity is to be found within the plan itself, the Court has no basis to look beyond its text. See Kerin v. United States Post Office, 116 F.3d 988, 991 (2d Cir.1997) (stating that determining whether a contract is ambiguous under federal common law should be done generally without resorting to extrinsic evidence); Consarc Corp. v. Marine Midland Bank, N.A., 996 F.2d 568, 573 (2d Cir.1993) (stating the same is true under New York law). The applicable standard both for contracts and for reorganization plans is that which the New York Court of Appeals set forth in a case involving the interpretation of an insurance policy:
Obviously, before the rules governing the construction of ambiguous contracts are triggered, the court must first find ambiguity in the policy. But here there is no ambiguity since the words in the paragraphs of the policy under examination have a definite and precise meaning, unattended by danger of misconception in the purport of the policy itself, and concerning which there is no reasonable basis for a difference of opinion.
Breed v. Insurance Company of North America, 46 N.Y.2d 351, 413 N.Y.S.2d 352, 385 N.E.2d 1280 (1978) (citations omitted). Where the language of the plan is unequivocal, therefore, a Court must adopt the plain and natural meaning only of the words contained within the text of the instrument itself. See United Merchants & Manufacturers, Inc., 24 C.B.C. 220, 226-27 (Bankr. S.D.N.Y.1981) (providing that "a plan is a kind of contract . . . [and] disputed provisions should be interpreted in light of general contract principles)".
In its decision below, the bankruptcy court held that the plan of reorganization was unequivocal in its rejection of the New Hartford lease. We agree. Cf. Ranch House of Orange-Brevard, Inc. v. Gluckstern (In re Ranch House of Orange-Brevard, Inc.), 773 F.2d 1166, 1168 (11th Cir.1985) (stating that a bankruptcy judge's finding that his confirmation order rejected an executory contract should not be readily disturbed). As is more fully quoted above, the plan expressly states that all "unexpired leases of each of the Debtors not previously assumed and assigned are hereby specifically rejected." Nor does the New Hartford lease appear on any exhibit as an exception to the general provision for lease rejection.
The dissent would find a latent ambiguity in that language of the Plan which specifically rejected all unexpired leases "not previously assumed and assigned" or otherwise identified as exceptions. We accept the statement adopted by the dissent, that a latent ambiguity is one that "is susceptible of explanation by a mere development of extraneous facts without altering or adding to the written language or requiring more to be understood thereby than will fairly comport with the ordinary or legal sense of the words made use of." 58 N.Y. JUR. 2D Evidence and Witnesses § 579 (1986). However, we cannot accept that a latent ambiguity arises in the present instance. Only one meaning can attach to the phrase "not previously assumed and assigned," namely that as of the date of confirmation, the lease must not have been assumed and assigned. For the New Hartford *304 lease, no closing of these events had occurred as of plan confirmation. Charter/Benderson had not accepted responsibility for the lease, and the landlord could look only to the debtor for recompense. There having been no assumption and assignment, the plan of reorganization by its unequivocal terms caused a lease rejection.
Contrary to the view of the dissent, we find that the rejection of leases resulted from plan provisions that were customized, not from those buried in boilerplate. The plan exempted from rejection those contracts and leases listed in a schedule prepared expressly for or by the debtor. The basis for the ruling adverse to Charter/Benderson is not the use of standard language, but the absence of the New Hartford lease from Exhibit E of the Plan. But even if the operative provisions were to be considered boilerplate, we cannot accept the contention that language of that character is to be disregarded. Lawyers are retained to be masters of the art of wordsmithery. Where complex concepts are regularly expressed, counsel may wisely utilize word combinations that they have tried and tested. Forms and form books have always served as valuable tools for the legal profession, to be used with discretion and when appropriate to express difficult ideas. We prefer to presume that the language of legal instruments is deliberately selected, not as filler, but because its words convey a desired idea. At no time should the source of language affect its efficacy. Rather, each word is to receive its customary meaning and natural interpretation, whether inserted as boilerplate or by particularized design.
We reject the contention that the debtor's plan left room for interpretation of ambiguities regarding the rejection of the New Hartford lease. Equally as damaging to Charter/Benderson's argument is the import of section 365(d)(4). By operation of this statute and the orders extending its time limits, leases of nonresidential real estate were to be deemed rejected unless assumed as of the confirmation hearing. Even if the Plan were ambiguous as to its express statement of rejection, nothing in the Plan provides for the assumption of the New Hartford Lease. Without assumption the lease is rejected, whether or not the plan's language of rejection is or is not equivocal.

INTERPRETATION OF "ORDER AUTHORIZING ASSUMPTION"
We further agree with the bankruptcy court's conclusion that the March 29th Order had merely authorized an assumption of the New Hartford Lease, and did not effect an assumption. By its language, the March 29th Order stated that the debtor was only "authorized to assume the New Hartford Lease." Such assumption was subject to further conditions. Thus, the order "authorized and directed [the debtor] to cure any and all defaults in the New Hartford Lease . . . in accordance with section 365(b) of the Bankruptcy Code, at the closing, and upon such cure of the defaults and such compensation for actual pecuniary loss . . . [the debtor] shall be and hereby is authorized to assume the New Hartford Lease." The conditions for assumption and assignment of this lease were simply not yet fulfilled as of the date of plan confirmation. Because the lease had not yet been assumed as of that time, it is deemed rejected pursuant to 11 U.S.C. § 365(d)(4).
It is beyond question that the March 29th Order was a final order that established law of the case. The March 29th Order without more did not constitute assumption but served merely to authorize the assumption of a lease. Pursuant to 11 U.S.C. § 365(a), it is the trustee, or debtor in possession, which, "subject to the court's approval, may assume or reject an executory contract or unexpired lease of the debtor." Though authorized to assume the New Hartford lease, the debtor was neither obliged to complete that assumption nor absolved from compliance with statutory limitations. Rather, the March 29th Order established as law of the case that the debtor could assume and assign the lease at any time until that lease was otherwise rejected.
Our learned colleague, in dissent, contends that a rejection of the New Hartford Lease violates the due process rights of Charter/Benderson. In support of this position, *305 he refers us to In Re Continental Country Club, Inc., 114 B.R. 763 (Bankr.M.D.Fla. 1990) and In re Parkwood Realty Corp., 157 B.R. 687 (Bankr.W.D.Wash.1993). Both cases, however, implicate rights of a party objecting to the rejection of its own contract. In the present instance, the Estate of William Morris fully supports rejection of the lease. Charter/Benderson as a putative vendee or assignee possesses no similar property interest. The March 29th Order conferred no leasehold interests, but merely allowed the debtor to transfer rights at some future occasion, if and when all necessary contingencies were fulfilled. Among these were important environmental contingencies and cure obligations. The agreement between the Debtor and Charter/Benderson was contingent as of March 29, and it remained contingent as of the date of plan confirmation. Indeed, Charter/Benderson never did close the precise agreement referenced in the March 29th order, but instead closed a modified agreement providing a different consideration. Even if Charter/Benderson possessed some property right by reason of its agreement with the debtor, that right was limited to the opportunity to close the transaction prior to the automatic rejection of the lease pursuant to 11 U.S.C. § 365(d)(4).

PLAN REFORMATION
Finally, Charter/Benderson urges that the plan be reformed to correct a mutual mistake. Mutuality of mistake, however, requires error on both sides. Nothing in the record indicates a mistaken belief by anyone that the lease had been assumed as of the date of plan confirmation. To the contrary, testimony on behalf of the debtor at the confirmation hearing clearly acknowledged that the lease assumption had not yet occurred. Otherwise, the debtor would have risked exposure to a claim for administrative rent at a time when it lacked any assurance of closing the assignment to Charter/Benderson. In sum, there was insufficient showing of mutuality in the alleged mistake to warrant reformation of the plan.
In substance, Charter/Benderson urges that the opportunity to assume the New Hartford lease be one of indefinite duration. The purpose of section 365(d)(4), however, is to assure that landlords receive a prompt decision as to the assumption or rejection of their leases with debtors in bankruptcy. The bankruptcy court extended to the date of plan confirmation the time to finalize assumption of the New Hartford lease. It did not grant an extension beyond that date. The Court's March 29th Order merely provided that within the window of opportunity for lease assignment, the debtor was authorized to consummate an agreement with Charter/Benderson. If the debtor had been unable to effect an assignment of its lease rights, surely it would now be arguing that any future obligations to the Estate of William Morris were extinguished by reason of the statutory rejection of the lease. To allow assumption at this late time would deny to the Estate of William Morris the finality that section 365(d)(4) was designed to assure. Because the debtor had not assumed the lease as of the date of confirmation, that lease is to be deemed rejected.

CONCLUSION
Accordingly, we find that the language of the plan was clear and unambiguous in its rejection of the New Hartford Lease such that extrinsic evidence is unavailable. In the alternative, the March 29th Order did not constitute an assumption and the lease is deemed rejected under section 365(d)(4) of the Bankruptcy Code.
For the reasons stated herein, we affirm the September 8, 1997, Memorandum-Decision and Order of the bankruptcy court in all respects.
KRECHEVSKY, Bankruptcy Judge, dissenting.
Because I view the matter before the appellate panel quite differently than my colleagues, I respectfully dissent. I do not consider the validity of a bankruptcy court's final order authorizing the assumption and assignment of an unexpired lease pursuant to an approved contract of sale to depend on its implementation by a plan confirmation date. Accordingly, § 365(d)(4) of the Bankruptcy Code (the "Code"), relied upon by the majority *306 to uphold the bankruptcy court, has no relevance. A restatement of the background to add additional facts from the record is appropriate.
A Background
Victory Markets, Inc. ("the debtor") and five wholly-owned subsidiaries filed Chapter 11 petitions on September 20, 1995. When it filed, the debtor operated fifty-seven grocery stores in northern and central New York, in premises which it either owned or leased. The debtor planned to reorganize by selling approximately thirty-five profitable store operations ("core properties") to independent owner-operators the debtor had previously employed. For stores not owned by the debtor, the debtor would assume the leases and assign them to the owner-operators. The debtor would sell its interest in or reject the leases at stores that were unprofitable or were not integral to its business ("non-core properties").
The debtor, on February 20, 1996, filed a timely motion[6] ("the February 20, 1996 motion") seeking authority to sell four parcels of improved real property and to assume and assign the lease of a store in a shopping center in New Hartford, New York ("the New Hartford lease" or "the lease"), in accordance with a purchase and sale agreement ("the Agreement") that the debtor, in early 1996, had entered into with Charter/Benderson. The debtor leased the New Hartford store from William Morris ("the appellee"), who received notice of the motion. The Agreement states that Charter/Benderson would pay $9.4 million[7] for the five properties provided, inter alia, that environmental tests demonstrated that "no significant environmental hazards" were present on a property and that the debtor obtained a final order authorizing it to assume and assign the New Hartford lease. The closing date for the transfer of the five properties under the Agreement was to be "within thirty (30) days after the removal or waiver of all contingencies stated [in the Agreement]."
After notice and a hearing, the bankruptcy court, on March 29, 1996, granted the February 20, 1996, motion and entered an order ("the assumption order") authorizing sale of the five properties according to the Agreement terms and stating "that Victory . . . hereby is authorized to assume the New Hartford Lease and, pursuant to Section 363 of the Bankruptcy Code, is authorized to assign all of its right, title, and interest in the New Hartford Lease to Charter under the terms of the Agreement." The assumption order also authorized the debtor to cure any and all defaults at the time of closing, and stated that "upon such cure of the defaults and such compensation for actual pecuniary loss . . . [the debtor] is authorized to assume the New Hartford Lease, and to sell and assign such lease to Charter under the terms of the Agreement." The appellee did not challenge this order.
The debtor, on August 27, 1996, filed a disclosure statement and liquidating reorganization plan. A list of the debtor's owned and leased real estate appended to the disclosure statement showed the five properties as non-core, with each of the five properties followed by the notation "[c]ourt-approved sale to Charter Realty . . .; pre-closing activities in process."
The reorganization plan did not mention the New Hartford lease by name. Section VI of the plan, entitled "Employee Pension Plans; Executory Contracts; Unexpired Leases," provided:
[a]ll executory contracts and unexpired leases of [the debtor] not previously assumed and assigned are hereby specifically rejected, except for (i) the executory contracts and unexpired leases listed on Exhibit E which are to be assumed pursuant to the Plan and (ii) any executory contracts and unexpired leases which are the subject of a motion to assume or assign pending before the Bankruptcy Court on the Confirmation Date.
*307 Exhibit E to the plan did not list the New Hartford lease, and the New Hartford lease was not the subject of a pending motion to assume or assign.
At the September 20, 1996, plan confirmation hearing, the debtor's attorney represented to the bankruptcy judge that the debtor had been in daily contact with Benderson since learning that Benderson had taken assignment of the Agreement, and that Benderson had indicated its desire to close the transaction as quickly as possible. The debtor's financial adviser, Paul Dzera ("Dzera"), testified that of the $3,500,000 in administrative expense claims to be paid by the debtor, $1,250,000 would be paid with borrowed funds and the remaining $2,250,000 would come from the sale of non-core properties, with the Charter/Benderson "deal" supplying most of the $2,250,000.[8] The bankruptcy judge said that "there are conceivably some problems with the . . . consummation of this plan" and that "[t]here are some ifs, here" because the asset sale to Charter/Benderson had not yet closed, but stated that Dzera's testimony had cured his skepticism and convinced him "that there is a reasonable chance of success." The bankruptcy judge confirmed the plan and signed a confirmation order on September 30, 1996.
The appellee, on October 25, 1996, filed a proof of claim for $147,359.89, asserting "damages arising from a possible rejection of" the New Hartford lease. On February 13, 1997, the appellee filed an "application" for an order declaring the New Hartford lease rejected or, if the court found that it had not been rejected, modifying the assumption order to provide that no closing could occur until the premises were repaired to the appellee's satisfaction, prohibiting "Benderson or a related entity" from obtaining an assignment of the lease, and permitting the appellee to purchase the lease on the same terms as Benderson was to receive. The debtor, on February 24, 1997, filed an objection to the relief requested and the bankruptcy court conducted a hearing on the application the next day.
The bankruptcy court, on September 8, 1997, issued its ruling on the appellee's application, concluding that the plan rejected the lease and ordering the debtor to surrender possession of the premises to the appellee.[9] The court held that a Chapter 11 plan is a contract between the debtor and its creditors and that if plan language is ambiguous, then the court may determine the parties' intent by considering parol evidence of prior negotiations or agreements that contradict or modify plan terms. The court decided that nothing in the plan contradicted the appellee's argument that the New Hartford lease was rejected. The court quoted from plan Section VI and observed that the New Hartford lease was not excepted from such rejection, was not listed in Exhibit E, and was not the subject of a motion concerning its assumption.
Having determined that the plan was not ambiguous, the court considered whether the lease had been previously assumed and assigned. As of the confirmation date, the court noted, the debtor and Charter/Benderson had not closed on the Agreement and the debtor had not assumed and assigned the lease. Furthermore, the plan did not provide for the debtor to assume the lease post-confirmation or evidence the debtor's intent in the event the deal did not close. The court concluded that "the Plan constitutes an integrated agreement which is to be enforced according to its terms."
B. Discussion
1. The Bankruptcy Court Was Bound to Enforce Its Own Final Order
A bankruptcy court order entered pursuant to § 365(a)[10] authorizing assumption and *308 assignment of a lease is a final order and enforceable according to its terms. See Bruder v. Peaches Records and Tapes, Inc. (In re Peaches Records and Tapes, Inc.), 51 B.R. 583, 587 (9th Cir. BAP 1985) ("Although certain acts remained to be performed by the parties after the entry of the lower court's order, no additional adjudication of rights and duties was necessary. The court was left only to enforce its order in accordance with its specific terms. . . . [The assumption and assignment order] finally and fully determined the rights of [the] parties. . . . ").
A court is bound to enforce its own final order. In Krikor Dulgarian Trust v. Unified Management Corp. of Rhode Island, Inc. (In re Peaberry's Ltd.), 205 B.R. 6 (1st Cir. BAP 1997), the bankruptcy court granted the Chapter 11 debtor's motion to assume the lease on a restaurant, on terms that included the debtor paying all rental arrearages in full. Id. at 7. Subsequently, the court approved a going concern sale of the debtor's assets, including assignment of the assumed lease to the purchaser. Id. When the sale closed, the debtor had not paid the rent claims. Id. After the debtor converted its case to Chapter 7, the lessor moved to compel payments of its lease arrearages, and a creditor objected. Id. The bankruptcy court denied the motion. Id. The Bankruptcy Appellate Panel reversed, concluding that "given the propriety of the assumption order and the absence of any timely challenge to its substance or regularity, the bankruptcy court was duty bound to enforce it according to its terms." Id. at 8. As in Peaberry's, the instant assumption order is a final order that the appellants, pursuant to their rights under the Agreement, were entitled to enforce. Nothing in the bankruptcy court's assumption order, or in the Agreement, required consummation of the lease assumption and assignment by a plan confirmation date if the conditions of sale had not then been satisfied. After its entry there was no need for further orders to continue the efficacy of the assumption order.[11] The bankruptcy court's ruling that the debtor's plan rejected the New Hartford lease denied the appellants their vested rights under the assumption order and the Agreement. The Agreement itself provided that "[t]ransfer of title to the Property is outside of any Chapter 11 plan of Seller or its affiliates." Agreement ¶ 7(b). The bankruptcy court erred in contravening the assumption order.
2. The Assumption Order Established the Law of the Case
"The law of the case doctrine `posits that when a court decides upon a rule of law, that decision should continue to govern the same issues in subsequent stages in the same case.'" Pescatore v. Pan American World Airways, Inc., 97 F.3d 1, 7-8 (2d Cir.1996) (quoting DiLaura v. Power Auth., 982 F.2d 73, 76 (2d Cir.1992)); Liona Corp., Inc. v. PCH Assocs. (In re PCH Assocs.), 949 F.2d 585, 592 (2d Cir.1991). See also Zdanok v. Glidden Co., Durkee Famous Foods Div., 327 F.2d 944, 952-53 (2d Cir.1964), cert. denied, 377 U.S. 934, 84 S.Ct. 1338, 12 L.Ed.2d 298 (1964) ("[W]here litigants have once battled for the court's decision, they should neither be required, nor without good reason permitted, to battle for it again.").
The bankruptcy judge clearly exercised his discretion when he authorized the debtor to assume and assign the lease to the appellant under the terms of the Agreement. The February 20, 1996, motion provided for the bankruptcy court to entertain "better and higher offers" prior to the entry of any order. The assumption order established the law of the case with respect to the debtor's treatment of and the appellants' entitlement to the lease. The bankruptcy court may not ignore the established law of the case.
*309 3. The "Boilerplate" Rejection Provision in the Debtor's Plan Is Not Effective to Reject the New Hartford Lease
The 1978 Bankruptcy Code in § 365(a) changed prior law by requiring that the bankruptcy court must in all cases under the Code determine whether to approve a trustee's or debtor in possession's request either to assume or to reject an unexpired lease of the debtor. The standard which courts use to authorize assumption or rejection is the "business judgment" test. See Orion Pictures Corp. v. Showtime Networks, Inc. (In re Orion Pictures Corp.), 4 F.3d 1095, 1099 (2d Cir.1993), cert. dismissed, 511 U.S. 1026, 114 S.Ct. 1418, 128 L.Ed.2d 88 (1994) ("[T]he process of deciding a motion to assume is one of the bankruptcy court placing itself in the position of the trustee or debtor-in-possession and determining whether assuming the contract would be a good business decision or a bad one.").
Questions of assumption or rejection of leases and executory contracts accordingly require, under the plain language of § 365(a), actual consideration by the bankruptcy court. See Continental Country Club, Inc. v. Burr (In re Continental Country Club, Inc.), 114 B.R. 763, 767 (Bankr.M.D.Fla.1990). General "boilerplate" language does not automatically effect assumption or rejection. Id. Because there had been no showing pursuant to the business judgment test upon which the court could have authorized rejection, the Continental Country Club court held that a Chapter 11 plan that, in Schedule A, rejected "[a]ll leases and executory contracts not listed in Schedule B, or assumed by [the debtor] prior to the entry of the Order confirming this plan," did not reject a former employee's employment contract, even though the contract was not identified in Schedules A or B and was not subject to a motion to assume or reject. Id. at 765-67. Likewise, citing Continental Country Club, the court in In re Parkwood Realty Corp., 157 B.R. 687 (Bankr. W.D.Wash.1993), held that "catch-all boilerplate language" to the effect that "[a]ll executory contracts or unexpired leases of [the debtor] which have not been previously rejected shall be deemed rejected on the Effective Date" did not reject a shareholder's agreement that was not expressly addressed in the plan because, inter alia, rejection requires actual consideration by the court. Id. at 689-91. "[T]o approve the rejection of an unidentified contract results in purely fictitious compliance with the Code." Id. at 691. Cf. In re Ferretti, 128 B.R. 16, 20-21 (Bankr.D.N.H.1991) (court rejects a disclosure statement containing "boiler plate language" which stated that ". . . all unexpired leases and executory contracts to which debtor is party shall be automatically rejected on confirmation, without further action by the debtor" with the comment that "[i]f there is nothing to reject that should be stated. If there is something to reject that should be stated along with the possible unsecured claim that might come out of that rejection.")
Section VI of the debtor's plan closely resembles the "catch-all boilerplate language" deemed ineffective in Continental Country Club and Parkwood Realty. As in both cited cases, the debtor's plan does not expressly address the New Hartford lease. The bankruptcy court actually considered the New Hartford lease and authorized the debtor to assume and assign it. The bankruptcy court also approved the Agreement under which the appellants obtained rights in the New Hartford lease. Because the court did not actually consider rejecting the lease, the business judgment standard was not met and the boilerplate rejection language in the debtor's plan was ineffective to eliminate the appellants' rights.
4. Rejection of the New Hartford Lease Violates Charter/Benderson's Due Process Rights
The Continental Country Club and Parkwood Realty courts also found the boilerplate rejection language in the respective plans to implicate due process concerns. In Continental Country Club, the court found that the former employee whose employment contract was purportedly rejected "was at least entitled to minimum due process protection." 114 B.R. at 767. Expanding this notion, the Parkwood Realty court concluded that Code § 1141(b)(1), which provides that plan confirmation "discharges the debtor from . . . any debt of a kind specified in section 502(g)," *310 and § 502(g), which addresses claims arising from the rejection of unexpired leases and executory contracts, together "clearly contemplate that a party to an executory contract will receive notice of rejection when it receives a copy of the Disclosure Statement and Plan." Parkwood Realty, 157 B.R. at 691. Because Parkside Lakes, the other party to the shareholder's agreement, received no notice of the reorganization plan, let alone the debtor's intention to reject the agreement, the court determined that rejection of the agreement would violate Parkside's Lake's due process rights. Id.
Both Continental Country Club and Parkwood Realty address the due process rights of the parties whose contracts were purportedly rejected by the respective plans. In contrast, the analogous entity in the appeal at hand, the appellee, claims rejection. However, the assumption order together with the Agreement established the appellants' rights with respect to the New Hartford lease and entitles the appellants to the same due process protection as the appellee. Nothing in the record indicates that the appellants received notice of the plan and its purported rejection of the lease. Under these circumstances, the bankruptcy court deprived the appellants of their due process rights in ruling that confirmation of the plan, without notice to the appellants and an opportunity to be heard, rejected the New Hartford lease. The doctrine that a confirmed plan of reorganization constitutes a binding contract between debtor and creditors has no pertinence to the appellants, who were not creditors.
5. The Plan Did Not Purport to Reject the Lease
An "extrinsic" ambiguity exists "when although the contract is clear at the semantic or literal level, anyone who knew something about the subject matter would realize that the contract probably did not mean what it said." U.S. v. Nat'l Steel Corp., 75 F.3d 1146, 1149 (7th Cir.1996). See also FDIC v. W.R. Grace & Co., 877 F.2d 614, 620 (7th Cir.1989), cert. denied, 494 U.S. 1056, 110 S.Ct. 1524, 108 L.Ed.2d 764 (1990) (stating that "[extrinsic ambiguity] is present when, although the agreement itself is a perfectly lucid and apparently complete specimen of English prose, anyone familiar with the realworld context of the agreement would wonder what it meant with reference to the particular question that has arisen"). Similarly, under New York law, which may apply here, "[a] latent ambiguity which may be explained by parol evidence occurs where the language employed is clear and intelligible and suggests but a single meaning, but some extrinsic fact or parol evidence creates a need to interpret the language or choose among two or more possible meanings." 58 NY JUR. 2D Evidence and Witnesses § 579 (1986). See Lerner v. Lerner, 120 A.D.2d 243, 508 N.Y.S.2d 191, 194 (1986) (finding a "classic example of a latent ambiguity" where the parties to a marital separation agreement disagreed as to whether "life insurance," the term used in the agreement, included preretirement death benefits of a pension plan). A latent ambiguity "is susceptible of explanation by a mere development of extraneous facts without altering or adding to the written language or requiring more to be understood thereby than will fairly comport with the ordinary or legal sense of the words made use of." 58 NY JUR. 2D Evidence and Witnesses § 579 (1986).
In the instant matter, a latent ambiguity exists in Section VI in the phrase "[a]ll executory contracts and unexpired leases of [the debtor] not previously assumed and assigned" (emphasis added). This phrase may mean what it would appear to mean to someone unfamiliar with the "real-world context" of the plan and with the Agreement, assumption order, disclosure statement, and confirmation testimony; or it may exclude unexpired leases, such as the New Hartford lease, that had been the subject of an assumption order. While the latter interpretation supplements the written language, it "fairly comports" with the ordinary use of the words in the plan. Anyone familiar with the debtor's reliance on the Agreement to fund its plan, the disclosure statement's indication that the appellants would purchase the lease and were engaged in pre-closing activities, and the bankruptcy judge's statement at the confirmation *311 hearing that testimony about the asset sale to Charter/Benderson had cured its skepticism of plan feasibility, would realize that the plan did not "mean what it said" with respect to rejecting the New Hartford lease, or would at least "wonder what it meant." In light of the debtor's and the bankruptcy court's reliance on the Agreement to fund the plan, it would "defy logic" to think that the plan rejected the New Hartford lease. Because a latent ambiguity exists, the bankruptcy court should have considered objective evidence  the Agreement, assumption order, disclosure statement, and confirmation testimony  in interpreting the plan.
C. Conclusion
I believe policy as well as jurisprudential considerations support the view I express. Purchasers of assets from a bankruptcy estate, such as unexpired leases, are entitled to rely on the final orders of the bankruptcy court approving the assumption and assignment of leases pursuant to an approved contract of sale. "Congress did not intend section [365(a)] to be a trap for the unwary." Feldman v. Trans-East Air, Inc., 497 F.2d 352, 355 (2d Cir.1974) (holding that a bankruptcy judge does not have discretion to vacate a prior order authorizing a debtor in possession to reject a lease where the order has created vested rights which its vacation would disturb).
I believe that the order of the bankruptcy court should be reversed and the lease declared not rejected.
NOTES
[1] Victory Markets, a party to the original motion, has not appealed the bankruptcy court's decision and has filed no papers in this appeal.
[2] Appellee appears not to have challenged the timeliness of the order to extend the assumption period. Accordingly, the panel need not consider the adequacy of the procedure which the debtor utilized.
[3] One of the more significant contingencies to which the executed purchase and sale contract was subject was Charter/Benderson's right to examine the property for environmental hazards which included Charter/Benderson's right to terminate the contract. There were also requirements for the curing of defaults and a closing to take place 30 days from the removal of all contingencies. See Joint App. A-243-47.
[4] William Morris died on February 7, 1997, during the pendency of these proceedings.
[5] Exhibit E to the First Amended Plan of reorganization is titled "Administrative and Super Administrative Claims to be Paid by Victory Markets." Charter/Benderson has alleged the wrong exhibit was attached. We find this argument unconvincing as no other exhibit could have been the intended exhibit and this fact was neither raised nor argued in the bankruptcy court.
[6] The motion was entitled "Motion for Authority to Sell Real Estate Out of the Ordinary Course of Business, to Assume and Assign Lease, to Reject Tenant Leases and to Lease-Back Certain Office Space."
[7] The sole amendment to the Agreement, dated February 27, 1996, inter alia, increased the purchase price to $9.525 million.
[8] The Agreement stated that "[t]his Contract is not severable as to individual properties; if a particular property fails a condition and/or contingency set forth in this Contract, then the entire Contract shall terminate upon written notice."
[9] At oral argument, it was disclosed that the parties consummated the Agreement and the debtor assigned the lease to Charter/Benderson after the February 25, 1997, hearing and prior to the bankruptcy court's ruling on September 8, 1997.
[10] Section 365(a) provides in relevant part: ". . . the trustee, subject to the court's approval, may assume or reject any executory contract or unexpired lease of the debtor." 11 U.S.C. § 365(a).
[11] The debtor's March 20, 1996, motion to extend the time to assume or reject executory contracts, which included the New Hartford lease, was rendered moot as to the New Hartford lease when the bankruptcy court entered the assumption order on March 29, 1996. Therefore, the majority's reference to the debtor "[p]resumably wishing to avoid an unintended rejection of the New Hartford lease: by "specifically referenc[ing] that lease in an order dated May 10, 1996"" is inapt.