REVISED APRIL 14, 2000

**UNITED STATES COURT OF APPEALS**

**FOR THE FIFTH CIRCUIT**

_____

No. 98-11116

_____

**In the Matter of NATIONAL GYPSUM COMPANY,**

Debtor,

_____

**CENTURY INDEMNITY CO.; INSURANCE COMPANY OF NORTH AMERICA,**

Appellees

V.

**NGC SETTLEMENT TRUST; ASBESTOS CLAIMS MANAGEMENT CORPORATION,**

Appellants,

_____

Appeal from the United States District Court

For the Northern District of Texas

March 31, 2000

Before EMILIO M. GARZA and PARKER, Circuit Judges; and FITZWATER, District Judge.[1]

_____

[1] District Judge for the Northern District of Texas, sitting by designation.

ROBERT M. PARKER, Circuit Judge:

Appellants,[2] a reorganized Chapter 11 Bankruptcy debtor, filed suit seeking a declaratory judgment that appellee's claim stemming from an assumed contract was discharged in the debtor's earlier bankruptcy proceedings. At summary judgment, the bankruptcy court determined that the claim was not discharged, but that the contract was assumed with a binding $0 cure amount. Both parties appealed. The district court, sitting as an appellate court, affirmed the discharge ruling but reversed as to the binding nature of the cure amount. The reorganized debtor appeals that ruling.[3] We AFFIRM.

## I. FACTS AND PROCEDURAL HISTORY

### A. *Background*

#### 1. *The Wellington Agreement*

---

[2] Throughout this opinion, the court will refer to the appellants collectively as National Gypsum Company ("National Gypsum"). National Gypsum is a reorganized Chapter 11 debtor. Under its plan of reorganization, most operating assets were conveyed to the New NGC, which assumed the name "National Gypsum Company," and the debtor National Gypsum changed its name to Asbestos Claims Management Corporation ("ACMC"). ACMC, which owns the rights under National Gypsum's insurance policies, became a subsidiary of the NGC Settlement Trust, created under the plan to provide payments to holders of asbestos-related claims against National Gypsum. Accordingly, NGC Settlement Trust and Asbestos Claims Management Corp. are the named appellants in this appeal.

[3] In addition to Plaintiffs/Appellants' substantive appeal, we have before us a pending motion -- Defendant/Appellee's Motion to Determine Appellate Jurisdiction. Defendant/Appellee contends that jurisdiction is proper; in their response, Plaintiffs/Appellants concur. Upon due consideration of the parties' filings, the record of the proceedings below, and the applicable law, we agree. JURISDICTION CONFIRMED.

2

National Gypsum Company ("National Gypsum") was a manufacturer of asbestos-containing products, while Insurance Company of North America ("INA") was one of its insurers, having issued liability insurance policies to National Gypsum in the 1950s. Beginning in the 1970s, National Gypsum was sued for bodily injury and property damage claims arising from the asbestos-containing products it sold. An insurance coverage dispute soon followed mirroring the litigation taking place throughout the country between other former asbestos manufacturers and their insurers.

A large part of this industry-wide litigation was ended when a number of parties reached a negotiated settlement, commonly referred to as the Wellington Agreement. This accord, signed in 1985 by numerous manufacturers and their insurers -- including National Gypsum and INA -- resolved persistent contribution and indemnity issues, thereby allowing for joint representation in thousands of pending asbestos-related lawsuits. The Wellington Agreement provided for the creation of the Asbestos Claims Facility to analyze, defend, and settle pending and future asbestos-related bodily injury claims referred to it by participating former asbestos producers. Under the agreement, funding for the payment of settlements, judgments, and legal expenses incurred in the defense of asbestos-related bodily injury claims against the party-producers was provided by the party-insurers.

But not all insurers signed the agreement, causing gaps in

3

coverage to arise where non-signatory insurer payments were called for. Under the Wellington Agreement, party-insurers agreed to make gap-filling payments to cover the non-signatory insurers' share of defense and indemnity costs. It was recognized that this would cause the insurers to pay out their policy limits more quickly than they would if the non-signatory insurers were participating. In response, Section XX of the Wellington Agreement was designed to compensate signatory insurers for these interim payments. Under Section XX, producers are required to use their best efforts to obtain coverage from non-signatory insurers. To encourage producers to pursue non-signatory insurers, interest on gap-filler payments begins to accrue two years after payment is made. The producer must thereafter pay interest quarterly until the earlier of (a) a settlement with or final judicial determination against the non-signatory insurer, or (b) the date on which the signatory insurer would have exhausted its policy limits if the non-signatory insurer had been a participating party to the Wellington Agreement.

Some of National Gypsum's insurers did not sign the Wellington Agreement, thus INA's successor in interest, Century Indemnity Company ("Century"), allegedly made gap-filling payments on behalf of National Gypsum for amounts owed by non-signatory insurers from October 1987 through May 1990. According to Century, Section XX interest accrued on the amount due to Century through March 1994, and prejudgment interest continues to accrue. Century claims that

4

National Gypsum has never paid any portion of the now more than five million dollars owed to Century.

*2. The Reorganization of National Gypsum*

National Gypsum filed a Chapter 11 bankruptcy petition October 28, 1990. As a part of its reorganization plan, National Gypsum sought to assume the Wellington Agreement, one of approximately 250 executory contracts or unexpired leases to which National Gypsum was a party. In accordance with Bankruptcy Code requirements, the National Gypsum plan detailed the cost to "cure" any existing defaults on these executory contracts or unexpired leases. National Gypsum's plan represented that the company was not in default on any payments under the Wellington Agreement, and therefore, the cost to cure all defaults was $0.

On March 9, 1993, the bankruptcy court entered its "Order Confirming the First Amended and Restated Joint Plan of Reorganization of National Gypsum Company and Aancor Holdings, Inc." confirming the National Gypsum plan of reorganization.

**B. Procedural History**

In October 1995, following attempts by Century to recover the amounts allegedly due, National Gypsum brought suit in the Bankruptcy Court for the Northern District of Texas seeking a declaration that its contract obligations to Century were discharged in the earlier Chapter 11 reorganization. Following discovery, National Gypsum moved for summary judgment claiming that

any amounts previously due were discharged, pursuant to 11 U.S.C. § 1141(d) (1994), for $0 because Century failed to file timely proof of its claim, despite having sufficient notice of the pendency of the bankruptcy to protect its interests, and that the bankruptcy court's confirmation order precluded re-litigation of this issue. After a hearing, the bankruptcy court granted summary judgment in favor of National Gypsum finding that Century was provided sufficient notice to be bound by the confirmation order which discharged Century's claims.

Century then moved the court to set aside the judgment and re-examine both issues. Ultimately, the bankruptcy court determined that confirmation of the plan *did not* discharge Century's right to payment under the Wellington Agreement, but that Century was precluded by *res judicata* from asserting that any amount other than $0 was due. The court reached this conclusion despite having found that there was a factual dispute as to whether Century had received the court-ordered notices that would have alerted it to the fact that the Wellington Agreement was being assumed with a $0 cure amount. In essence, the bankruptcy court determined that this factual question was immaterial, because mere knowledge of the pendency of the bankruptcy action was sufficient in and of itself to bind Century.

Both parties appealed to the District Court for the Northern District of Texas. The district court ruled in Century's favor on

all three issues -- discharge of the claim, sufficiency of the notice, and *res judicata* effect of the confirmation. The district court affirmed the bankruptcy court's holding that Century's right to payment was not discharged, reasoning that the discharge provision of § 1141(d) could not be so inflated as to wipe out the requirements of 11 U.S.C. § 365 (1994) (the section of the Bankruptcy Code that governs executory contracts and unexpired leases) that all executory contracts be brought current as a condition of their assumption.

The district court reversed the bankruptcy court on the notice issue, holding instead that the debtor had a responsibility to assure that the non-debtor party was on notice of the debtor's specific intent to assume the contract. The court then demonstrated that National Gypsum was unable to meet this standard based on the summary judgment record for two reasons. First, there existed a fact question whether Century was sent copies of crucial notices and mailings that the bankruptcy court had ordered to be sent to all affected parties. Specifically, did Century receive either the plan or the notice enumerating which executory contracts National Gypsum intended to assume, either one of which would have alerted Century that the Wellington Agreement was being assumed with a $0 cure amount? Second, the summary judgment proof demonstrated only that a representative of Century knew of the commencement of National Gypsum's Chapter 11 reorganization, not of

7

the specific intent to assume.  Consequently, the district court found that Century's due process rights had been violated.

Finally, the district court held that the confirmation order was not *res judicata* as to the cure amount, because the bankruptcy court "unambiguously anticipated disputes regarding cure amounts and retained jurisdiction to hear them."  National Gypsum took an appeal from the district court's judgment, placing all three issues before us today.

## II.  DISCUSSION

### A.  *Standard of Review*

Bankruptcy court rulings and decisions are reviewed by a court of appeals under the same standards employed by the district court hearing the appeal from bankruptcy court; conclusions of law are reviewed *de novo*, findings of fact are reviewed for clear error, and mixed questions of fact and law are reviewed *de novo*.  *See Traina v. Whitney National Bank*, 109 F.3d 244, 246 (5th Cir. 1997). We review a grant of summary judgment *de novo*.  *See Exxon Corp v. Baton Rouge Oil*, 77 F.3d 850, 853 (5th Cir. 1996).

### B.  *Century's Claims Were Not Discharged*

#### 1.  *Contentions of the Parties*

National Gypsum argues that Century is barred from recovery because Century failed to take the necessary steps to protect its claim prior to confirmation of National Gypsum's reorganization plan.  Purportedly, Century possessed a provable claim, because it

8

was owed Section XX reimbursement payments prior to the reorganization. Under this theory, Century erred by failing to file a proof of its claim prior to the bar date, as a result, the claim was discharged along with all other unproven pre-confirmation debts by operation of the general discharge provision of Bankruptcy Code § 1141(d). National Gypsum's argument rests on a belief that an amount due in default on an assumed executory contract is subject to the claims discharge provisions of § 1141(d), and thereby removed from the cure provisions of § 365 that require prompt compensation for any default. Both the bankruptcy court and the district court were correct to reject this argument.

2. *Bankruptcy Code Sections 1141(d) and 365*

Section § 1141(d) binds some creditors to the terms of the confirmed reorganization plan while discharging all others. *See* 11 U.S.C. § 1141(d)(1)(A) (1994) ("Except as otherwise provided for in the plan or the order confirming the plan, the confirmation of a plan . . . discharges the debtor from any debt that arose before the date of such confirmation."). Section 1141(d) also enumerates different types of "claims" that are excepted from discharge. *See* § 1141(d) (the debtor is discharged from any debt "[e]xcept as otherwise provided for in this subsection"). Although National Gypsum correctly points out that the list of exceptions is exclusive and makes no reference to § 365, it is incorrect to extrapolate from this that a default amount owed on an executory

9

contract is always a "claim" within the ambit of § 1141(d).

The Bankruptcy Code provides special rules for the treatment of executory contracts and unexpired leases during a Chapter 11 reorganization. See 11 U.S.C. § 365 (1994). In general, section 365 allows "the trustee, subject to the court's approval, [to] assume or reject any executory contract or unexpired lease of the debtor." Id. Under § 365, a debtor may elect one of two options when assessing how to treat an executory contract or unexpired lease to which it is a party; the contract or lease may either be rejected or assumed.[4]

"[T]he authority to reject an executory contract is vital to the basic purpose of a Chapter 11 reorganization, because rejection can release the debtor's estate from burdensome obligations that can impede a successful reorganization." *NLRB v. Bildisco & Bildisco*, 465 U.S. 513, 528 (1984). The Bankruptcy Code provides that the effect of a rejection of an executory contract is a breach, *see* 11 U.S.C. § 365(g) (1994), and the breach gives rise to a claim for damages by the non-debtor party to the contract. *See Wainer v. A.J. Equities, Ltd.*, 984 F.2d 679, 684 (5th Cir. 1993); *see also Bildisco*, 465 U.S. at 518. The "claim" created by the rejection of the contract or lease is then afforded treatment

---

[4] If an executory contract is neither assumed nor rejected, it will "ride through" the proceedings and be binding on the debtor even after a discharge is granted, thus allowing the non-debtor's claim to survive the bankruptcy. *See Federal's, Inc. v. Edmonton Inv. Co.*, 555 F.2d 577, 579 (6th Cir. 1977).

10

similar to all other unsecured claims that are either provided for in the plan or are discharged through § 1141(d). The non-debtor whose lease or contract is rejected is then afforded the opportunity, *subsequent to the debtor's decision on how to treat the contract or lease*, to protect its interests by filing a proof of "claim" after which the non-debtor is treated as an unsecured creditor. *See In re Parkwood Realty Corp.*, 157 B.R. 687, 690 (W.D. Wash. 1993).("[The Code] clearly contemplate[s] that a party to an executory contract will receive notice of rejection when it receives a copy of the Disclosure Statement and Plan, giving it a window in which to file a proof of claim for damages."); *see also* LAWRENCE P. KING, ET AL., COLLIER ON BANKRUPTCY § 365.09[1] (15th ed. 1999) (hereinafter "COLLIER ON BANKRUPTCY").[5] The non-debtor, former contractual partner only becomes an unsecured creditor after rejection. Therefore, the non-debtor is not required to have filed a proof of claim prior to the claims bar date, a date that in all likelihood preceded the debtor's decision to reject the contract or

---

[5] The debtor may delay making a decision and simply provide for assumption or rejection in the plan itself. "This is often a useful means for the debtor to avoid binding itself to contracts or leases before it has formulated a feasible business plan under which it knows whether it will want the benefits and burdens of each agreement." COLLIER ON BANKRUPTCY § 365.04[2][a]. In sum, the Bankruptcy Code sets forth a scheme in which the debtor maintains almost exclusive control over the timing of its decision on assumption or rejection to ensure that its decision contributes to a workable plan of reorganization. In turn, the non-debtor party is then afforded time to take steps to protect its interest *after* the debtor has determined the status of the contract.

lease.[6]

Rather than reject the contract or lease, the debtor may choose to assume it. An assumed lease or contract will remain in effect through and then after the completion of the reorganization. The non-debtor party to the agreement is not released from its duties and must continue to perform; likewise, the debtor must continue to perform or pay for the services or other costs that are not discharged. "[T]he act of assumption must be grounded, at least in part, in the conclusion that maintenance of the contract is more beneficial to the estate than doing without the other party's services." *MMR Holding Corp. v. C&C Consultants, Inc. (In re MMR Holding Corp.)*, 203 B.R. 605, 612 (Bankr. M.D. La. 1996); *see In re Eagle Bus Mfg., Inc.*, 148 B.R. 481, 483 (Bankr. S.D. Tex. 1992). Since not all contracts are zero-sum bargains, the contract will not necessarily be a detriment to the other party.

---

[6] It should be noted that adoption of National Gypsum's contrary analysis would have a perverse effect outside the scope of this case, an effect that would be felt by non-debtor parties whose contracts or leases are rejected. Contrary to the explicit statements of the Code, the act of rejection would only create a bona fide claim for damages if the non-debtor had already filed a preemptive, conjectural proof of claim earlier in the bankruptcy proceedings. The decision to assume or reject would cease to be the determining factor as to whether the debtor had a claim; instead it would be the non-debtor's filing of a proof of claim that would be dispositive. This scheme -- unappealing from a policy perspective as it would result in a deluge of potentially pointless preemptive proofs of claims -- is inconsistent with the Bankruptcy Code's more prudent approach, which is to simply permit those non-debtors whose contracts or leases were rejected to react to the debtor's decision.

12

Nevertheless, it is the debtor who decides whether to maintain the contract, and this authority vests the debtor with a considerable amount of power:

> Section 365 is intended to provide a means whereby a debtor can force another party to an executory contract to continue to perform under the contract if (1) the debtor can provide adequate assurance that it, too, will continue to perform, and if (2) the debtor can cure any defaults in its past performance. The provision provides a means whereby a debtor can force others to continue to do business with it when the bankruptcy filing might otherwise make them reluctant to do so. The section thus serves the purpose of making the debtor's rehabilitation more likely.

*Richmond Leasing Co. v. Capital Bank, N.A.*, 762 F.2d 1303, 1310 (5th Cir. 1985); *see* RICHARD I. AARON, BANKRUPTCY LAW FUNDAMENTALS, § 9.04[3] (1999) ("The power to reject unfavorable contracts is a potent weapon in the arsenal of unique bankruptcy powers.").

Not surprisingly, the Bankruptcy Code affords the non-debtor a measure of protection, since it is possible that the contract is not beneficial to the non-debtor, and the non-debtor lacks any decision-making authority in the assumption process.[7] Section 365 "allows a debtor to 'continue in a beneficial contract provided, however, that the other party is made whole at the time of the debtor's assumption of said contract.'" *Eagle Bus*, 148 B.R. at 483 (quoting *In re J.W. Mays*, 30 B.R. 769, 772 (Bankr. S.D.N.Y. 1983)).

---

[7] The non-debtor may by motion to the court seek to have a deadline imposed on the debtor's assumption decision, but other than this limited ability to prompt a decision, the non-debtor is without power over the assumption process. *See* § 365(d)(2); COLLIER ON BANKRUPTCY § 365.04[2][b].

13

This cure requirement is set forth in § 365(b)(1):

> If there has been a default in an executory contract or unexpired lease of the debtor, the trustee may not assume such contract or lease unless, at the time of assumption of such contract or lease, the trustee–
>    (A) cures, or provides adequate assurance that the trustee will promptly cure, such default;
>    (B) compensates, or provides adequate assurance that the trustee will promptly compensate, a party other than the debtor to such contract or lease, for any actual pecuniary loss to such party resulting from such default; and
>    (C) provides adequate assurance of future performance under such contract or lease.

11 U.S.C. § 365.

Thus, the debtor party must take full account of the cost to cure all existing defaults owed to the non-debtor party when assessing whether the contract is beneficial to the estate. *See Three Sisters Partners, L.L.C. v. Harden (In re Shangra La, Inc.)*, 167 F.3d 843, 849 (4th Cir. 1999); *MMR Holding*, 203 B.R. at 613 ("Assumption presumes curing all prepetition default . . . .").

A non-debtor is further protected by the requirement that an executory contract may not be assumed in part and rejected in part. *See* COLLIER ON BANKRUPTCY § 365.03[1]. Where the debtor assumes an executory contract, it must assume the entire contract, *cum onere* – the debtor accepts both the obligations and the benefits of the executory contract. *See Bildisco*, 465 U.S. at 531. Although this rule can have broader application, in the instant case this condition serves only to reinforce the cure requirement of § 365(b)(1). *See Adventure Resources, Inc. v. Holland*, 137 F.3d 786, 798 (4th Cir. 1998) ("That the obligations of an executory contract

14

be accepted along with its benefits is made plain by the Bankruptcy Code's requirement that, as conditions of the contract's assumption, the debtor cure any existing default and compensate all non-debtor parties for actual pecuniary losses that have resulted therefrom.").

National Gypsum asks us to find that § 1141(d)(1) can be read to provide for discharge of amounts in default under assumed executory contracts, thereby nullifying the cure requirement of section 365(b)(1). The bankruptcy and district courts, citing our opinion in *Wainer v. A.J. Equities, Ltd.*, 984 F.2d 679 (5th Cir. 19993), held that the discharge power of § 1141(d) does not reach out to extinguish the need to cure existing default on executory contracts that are assumed by the reorganized debtor. We agree.

*3. The Wainer Decision*

In *Wainer*, the lessor consented to release an existing tenant and allow the assumption and assignment of the lease to a new tenant. Subsequently, the lessor filed suit against the debtor's guarantor after the lease assignee filed bankruptcy and rejected the lease. We ruled that the lessor had novated the lease by consenting to the assumption and assignment, thereby waiving its right to require a guarantee of the assignee's obligations. 984 F.2d at 685. Thus, a landlord, who would otherwise be free to pursue a guarantor if the lease is rejected, cannot pursue a guarantor if the lease is assumed. This stems from the fact that,

15

in accordance with § 365(b), the lease is brought back into compliance with its terms, and the other party to the lease is compensated for any interim pecuniary loss. *See* COLLIER ON BANKRUPTCY § 365.05[3]. The end result is that there is no default to prompt liability against the guarantor.

Although our analysis in *Wainer* continued on from this point to determine the validity of the novation, it is only the Court's treatment of § 365 that is of relevance to the case at bar. In this key portion of our discussion, we noted the only instance in which the Bankruptcy Code speaks of a claim arising from an unexpired lease or executory contract -- when the contract or lease has been rejected:

> *A claim arising from the rejection*, under section 365 of this title ... of an *executory contract* or unexpired lease of the debtor *that has not been assumed* shall be determined, and shall be allowed under subsection (a), (b) or (c) of this section or disallowed under subsection (d) or (e) of this section....

*Wainer*, 984 F.2d at 684 (quoting 11 U.S.C. § 502(g) (1994) (discussing post-petition debts))(emphasis added.). In addition, we noted that section 365(g) explains that the rejection of an unexpired lease constitutes a breach of the lease, giving rise to a claim. *See* 11 U.S.C. § 365(g) (1994).

In light of the absence of any reference to a claim arising from the assumption of a contract and the express cure provisions for dealing with existing defaults, we concluded that "under the

16

Bankruptcy Code, a lease that has been *assumed* under a plan or pursuant to section 365 does not give rise to a claim." *Wainer,* 984 F.2d at 684 (emphasis in original). The fact that the lease in question was both assumed and assigned was not dispositive to our conclusion on the discharge issue. *See id.* at 684-85 ("[the debtor] did not reject the Lease and, thus, no claim arose in its bankruptcy proceedings to bring about a debt which may have been discharged.").

Despite these plain statements, National Gypsum points to a single sentence in which we stated "[w]hen a lease is assumed and assigned to a third party pursuant to section 365 . . . it does not discharge a debt." *Id.* at 684. This is a correct statement of our conclusion in that case in which the lease at issue was assumed *and assigned.* There was no emphasis placed on "assigned" in this lone sentence from which to conclude that the assignment was critical to the "no discharge" conclusion. In sum, the court affirmed that a claim arises only from the rejection of an unexpired lease or executory contract, not from the assumption of such a lease or contract.[8]

---

[8] This determination is not a new one to this court as we discussed the issue tangentially in the context of a discussion on voting rights under Chapter 11. *See Phoenix Mut. Life Ins. Co. v. Greystone III Joint Venture (In re Greystone III Joint Venture)*, 995 F.2d 1274, 1281 (5th Cir. 1991) ("A party to a lease is considered a 'creditor' . . . only when the party has a claim against the estate that arises from rejection of a lease. If, however, the debtor expressly assumes a lease, the lessee has no 'claim' against the debtor. . . .").

If the language we employed in *Wainer* was inexact, even a cursory examination of the supporting case citations and subsequent case law dispels any confusion over the issue. In *Wainer*, we made favorable reference to *Federal's, Inc. v. Edmonton Inv. Co.*, 555 F.2d 577, 581 (6th Cir. 1977). In *Edmonton*, also a case dealing with an assumption and assignment scenario, our sister court explained that a default does not give rise to a dischargeable claim:

> [There are] two specific events that may give rise to a provable claim under the lease, even though the lease was not rejected. These events are an automatic termination of the lease or an actual breach and subsequent termination by the landlord, occurring either contemporaneously with or prior to the commencement of the proceedings. Neither of those events occurred in the present case. Thus, *the default of the assignee alone did not give Edmonton a provable claim against Federal's*, and such default failed to alter the character of the executory contract between Edmonton and Federal's.

555 F.2d at 581 (emphasis added)(footnote omitted).

Similarly in *In re Marble Publ'g Co.*, 20 B.R. 933, 935 (Bankr. E.D. Pa. 1982), the bankruptcy court denied a complaint seeking an order compelling the debtor to cure an existing default on a lease by payment of pre-petition rent. In explaining the effects of assumption under § 365, the Court explained:

> . . . if an unexpired lease is assumed by a debtor in possession under the Code, and such action is approved by the court, such assumption creates a new administrative obligation of the estate which is payable as a first

18

priority . . . . Equally important is the fact that *such assumed obligation is a postpetition debt that is not discharged by a confirmation of a chapter 11 case, and it therefore continues to be an obligation of the reorganized debtor.*

*Marble Publ'g*, 20 B.R. at 934 (emphasis added)(footnote omitted).

National Gypsum's argument that the "no discharge" conclusion in *Wainer* hinged upon the assignment of the lease is unpersuasive; it is unsupported by the plain language of the Bankruptcy Code and circuit precedent. In addition, National Gypsum's position is contrary to other supporting authority not cited in our earlier opinion. Specifically, our conclusion today is in accord with that reached by the Fourth Circuit. In the seminal case *Consolidated Gas Elec. Light & Power Co. v. United Ry. & Elec. Co.*, 85 F.2d 799 (4th Cir. 1936), our sister court addressed the issue of whether an executory contract, neither assumed nor rejected, remains enforceable. The Fourth Circuit rebuffed the argument that a party to an un-rejected executory contract had a definite interest and, consequently, had a claim against the debtor, occupying the role of a creditor with all its attendant duties. *See Consolidated Gas,* 85 F.2d at 804. Instead, the court held that a claim under an executory contract does not arise within the meaning of the Bankruptcy Act until the contract has been rejected. *See id.* The court reasoned:

> The party to an executory contract would find it difficult to state a claim under the contract before it

19

had been broken;  and certainly neither the debtor nor the trustee could set out the amount of such a claim as required by an order of court directing the filing of schedules ... and the holder of a contract would have a like difficulty in complying with the customary order of the judge with reference to the filing of claims by creditors[.]

*Consolidated Gas*, 85 F.2d at 805; *see also Hotz v. Fed. Reserve Bank of Kansas City*, 108 F.2d 216, 219 (8th Cir. 1939); *In re DeVlieg, Inc.*, No. 93-C-20104, 1993 WL 248205, at *2 (N.D. Ill. July 6, 1993).

Finally, it should be noted that implementation of National Gypsum's theory would strip § 365(g) of any operational effect by eviscerating the protections it offers non-debtor parties.  In this case, National Gypsum attempts to turn what is a shield for the non-debtor party into a sword for the debtor.  This is not the intent of the Bankruptcy Code.  The contention that a pre-confirmation claim, subject to discharge, was created by arrearage on the contract is incompatible with the language of § 365 which specifically contemplates such instances when it requires the debtor to cure any default. Section 365(b)(1) provides a guarantee to the non-debtor party, who may be forced to continue a relationship it would rather terminate, that as condition to the forced continuation of the contractual relationship, any losses or defaults existing at the time will be satisfied either through a timely cure or through reasonable assurances of future payment.

20

National Gypsum would undermine this protection by imposing an extra-statutory requirement: that the right to cure must be preemptively protected by the filing of a proof of claim. Failure to make a timely filing of this theoretical claim would preclude the non-debtor from recovery on the amounts owed. In effect, contracts that would otherwise not be beneficial to the estate could become beneficial once the detrimental side of the ledger was wiped clean. This runs contrary to the Code's treatment of non-debtor parties to assumed contracts in which it acknowledges their unusual predicament and accordingly provides protections not offered to ordinary creditors subject to § 1141(d) discharge.[9]

The powers of the debtor in the assumption of contract arena

_____

[9] National Gypsum also argues that the rejection of inquiry notice standard will prompt non-debtor parties to executory contracts to sit on their rights and wait to come forward only after the contract has been assumed. Purportedly, this "lie in wait" strategy would allow the non-debtor to avoid receiving only "the normal 'cents-on-the-dollar' distribution accorded to other creditors." The non-debtor would come forward post-confirmation and assert a claim for the full cure amount.
In the context of assumption of executory contracts, there is far less to fear in the way of non-debtors waiting out the process, than there is of creditors waiting out the discharge of unsecured debts. Non-debtor parties to executory contracts must be made whole as part of the assumption; there is no point in waiting because there will be no "cents-on-the-dollar" distribution. Actually, the risk runs in the opposite direction: it is far more likely that a reduced standard of notice would encourage debtors to be careless in determining, or to intentionally understate, cure amounts, then fail to provide ordered adequate formal notice in order to avoid payment on contractual sums owed. According to Century, this is exactly what occurred in this case, where little internal scrutiny was given to the setting of the cure amount by National Gypsum.

should not be so needlessly aggrandized. Accordingly, we hold that § 1141(d) cannot be read to provide for discharge of amounts in default under assumed contracts in a manner that would nullify the cure requirement of section 365(b)(1).

## B.  *Notice*

### 1.  *The Contentions of the Parties*

Our "no discharge" conclusion necessitates consideration of the lower courts' split on the issue of notice. The question remains whether, due to inadequate notice, Century was deprived of its ability to take reasonable measures to protect itself from having the executory contract to which it was a party assumed with a $0 cure amount.

The bankruptcy court recognized that there was a fact question as to the formal notice received by Century. The court reasoned that the same standard of notice applicable to unsecured creditors -- mere knowledge of the pendency of the reorganization -- applied with equal force to non-debtor parties to executory contracts. Accordingly, the insufficiency of formal (or sufficiently particularized actual) notice was not thought to be dispositive in this case, because the summary judgment record reflected that a representative of Century was aware of the commencement of the National Gypsum reorganization. The district court reversed, concluding that formal notice was necessary, and that the fact

question as to formal notice would have to be resolved by the bankruptcy court on remand. In essence, the lower courts agreed that unsecured creditors and non-debtor parties to executory contracts in default are treated differently under the substantive Code sections governing discharge and assumption, but the courts disagreed as to whether the distinction was carried over into the procedural Code sections governing discharge and assumption.

National Gypsum contends that the bankruptcy court was correct to dispose of this issue on constitutional due process grounds pursuant to *Sequa Corp. v. Christopher (Matter of Christopher)*, 28 F.3d 512 (5th Cir. 1994), rather than on statutory grounds pursuant to § 365 and Bankruptcy Rule 6006. Based on this analysis, National Gypsum concludes that Century is barred from recovery even though a fact question remains concerning whether Century received the formal notice ordered by the court. We conclude that the district court correctly rejected this analysis, because the result is controlled by the Bankruptcy Code and Rules, obviating the need to ascertain how constitutional due process considerations would fill the perceived statutory lacuna. Even if there was a gap to fill, the constitutional due process standard set forth in *Christopher* has never been extended to apply to assumption of executory contracts.[10]

---

[10] In *Christopher,* the debtor filed suit seeking a declaratory judgment that post-petition claims made against him were discharged through confirmation of his plan of reorganization. 28 F.3d at

23

*2.    The Governing Statutory and Rule Provisions*

"As a general matter, a party seeking relief in bankruptcy court is not entitled to achieve a *fait accompli* with respect to the protectable interests of parties who did not receive notice prior to any loss with respect to their interest." 7 COLLIER ON BANKRUPTCY § 1109.06[2]. In furtherance of this end, the Bankruptcy Code is replete with provisions requiring proper notice to all

---

514. The creditors' claims arose out of the debtor's breach of contract for the acquisition of a subsidiary corporation. During the negotiations of the deal, the creditors were "made aware" of the debtor's prior petition for Chapter 11 relief. *Id.* at 513-14. Since the claims arose post-petition, the creditors were not required to be listed. They were not listed as creditors and did not participate in any of the bankruptcy proceedings.

The bankruptcy court concluded that the creditors were deprived of due process with respect to their unsecured claims, and therefore, they were not bound by the terms of the confirmed reorganization plan. On appeal, we determined first that the matter was not controlled by the statutory provisions of the Code. Second, we addressed the constitutional requirements of due process, in the context of unsecured creditors' claims, expanding on our earlier holding in *Grossie v. Sam (Matter of Sam)*, 894 F.2d 778 (5th Cir. 1990). In *Sam*, we held that "all constitutional due process requires ... is that [the creditor] have 'notice reasonably calculated, under all the circumstances, to apprise [him] of the pendency of the action and afford [him] an opportunity to present [his] objections.'" *Id.* at 781 (quoting *Mullane v. Central Hanover Bank & Trust Co.*, 339 U.S. 306, 314 (1950)). Applying the standard from *Sam*, the *Christopher* panel concluded that "it does not offend due process to view actual notice of a debtor's bankruptcy to a [prepetition] creditor as placing a burden on the creditor to come forward with his claim." *Matter of Christopher*, 28 F.3d at 517 (stating that as to claims "due process requires only notice that is both adequate to apprise a party of the pendency of an action affecting its rights and timely enough to allow the party to present its objections."). No Fifth Circuit case subsequent to *Christopher* and *Sam* has extended the due process standard from the discharge of debts to cure amounts of assumed contracts.

parties affected by the proceedings. *See, e.g.,* BANKR. RULE 6006. The notice question presented by this case arises, in part, because of the peculiar wording of Rule 6006.

The district court based its conclusion on notice largely upon the closely analogous case of *Republic Health Corp. v. Coral Gables, Ltd. (In re REPH Acquisition Co.)*, 134 B.R. 194 (N.D. Tex. 1991). In *REPH*, the district court decided a bankruptcy appeal involving an order denying a motion to assume an unexpired lease. 134 B.R. at 195. The court affirmed the denial of the motion to assume. *Id.* at 202. In so doing, the court rejected the Chapter 11 debtor's assertion that general notice of the existence of a plan of reorganization provided sufficient notice of the debtor's intent to assume the unexpired lease as part of the plan. *Id.* at 199. Instead, the court held that the debtor had responsibility to assure that the lessee was on notice of the debtor's specific intent to assume the lease. *See id.* The court based its conclusion upon its reading of Bankruptcy Rule 6006 which provides:

> <u>Assumption, Rejection or Assignment of an Executory Contract or Unexpired Lease</u>
> (a) Proceeding to assume, reject, or assign
> A proceeding to assume, reject, or assign an executory contract or unexpired lease, other than as part of a plan, is governed by Rule 9014.
> * * *
> (c) Notice
> Notice of a motion made pursuant to subdivision (a) or (b) of this rule shall be given to the other party to the contract or lease, to other parties in interest as the court may direct, and, . . . to the United States trustee.

BANKR. RULE 6006.

25

As other courts have noted, the setting of cure amounts is "not otherwise governed by" the Bankruptcy Rules, and thus falls under the auspices of Rule 9014. *See, e.g., O'Brien Envtl. Energy, Inc. v. NRG*, 188 F.3d 116, 123 (3rd Cir. 1999). Bankruptcy Rule 9014 states, in pertinent part:

> In a contested matter in a case under the Code not otherwise governed by these rules, relief shall be requested by motion, and reasonable notice and opportunity for hearing shall be afforded the party against whom relief is sought.

BANKR. RULE 9014.

National Gypsum takes the position that the "other than as part of a plan" language absolves the reorganizing debtor of responsibility to provide notice of its intent to either reject or assume the contract or lease. Once the non-debtor party to the contract or lease can be deemed aware that the reorganization has been filed, the onus is on the non-debtor contractual partner to follow the progress of the bankruptcy proceedings. The *REPH* court determined that Congress in fact adopted the contrary approach.

> Rule 6006(a) excuses the procedure that applies in contested matters when a proceeding to assume an unexpired lease is "part of a plan." *Fairly interpreted, Rule 6006(a) does not eliminate the notice requirements applicable to a contested matter.* Rule 9014, which governs contested matters not otherwise covered by the Bankruptcy Rules, requires that relief be requested on reasonable notice to the party against whom the relief is sought. The court holds that Rule 6006(a) implies a similar obligation upon a debtor who seeks to assume an unexpired nonresidential lease by means of its proposed reorganization plan. *This means that although the plan itself constitutes the act of assumption contemplated by § 365(d)(4), the lessor, as the party against whom the*

26

> *relief is sought, must be given reasonable notice of the debtor's intent.* Even if Rule 6006(a) cannot be read to incorporate the notice requirement of Rule 9014, § 1125(b) of the Code plainly requires that the contents of a proposed reorganization plan be adequately disclosed

*REPH*, 134 B.R. at 199 (emphasis added)(footnote omitted). In sum, the phrase "other than as part of a plan" was intended only to obviate the need to file a separate motion expressing the intent to assume or reject. Rule 6006 was not intended to establish a two-tier standard of notice in which formal notice is required if the assumption is to be by motion, but if assumption is to be by plan, the responsibilities of the debtor are radically diminished.

The vast majority of the cases addressing the level of notice required involve situations in which the debtor expressed its intent to assume by motion to the court. There is a paucity of cases in which sufficiency of notice is considered when the debtor expressed its intent to assume only in its proposed plan of reorganization. In cases where intent to assume is revealed by motion, courts require strict adherence to the requirements of § 365 and Rules 6006 and 9014 out of "concern with protecting unknowing [contractual partners] from the consequences of an assumption of which they had no notice and which [they] had no opportunity to contest." *Elliot v. Four Seasons Properties (In re Frontier Properties, Inc.)*, 979 F.2d 1358, 1365 (9th Cir. 1992); *see also South Street Seaport Ltd. Partnership v. Burger Boys, Inc. (In re Burger Boys, Inc.)*, 94 F.3d 755, 763 (2d Cir. 1996)(vacating

27

district court's decision to allow assumption when lessee was not provided formal notice and was deprived of an opportunity to contest the matter); *In re Typocraft Co.*, 229 B.R. 685, 689 (Bankr. E.D. Mich. 1999) (disallowing "assumption by an informal, default method without the affirmative filing of a motion with notice to interested parties").

Strict adherence to the Code provisions governing assumption of contracts "might appear overly simplistic, [but] it is important in that it allows a debtor in possession the flexibility intended by the Bankruptcy Code in deciding whether or not to assume or reject contracts or leases." *Walat Farms, Inc. v. United States (In re Walat Farms, Inc.)*, 69 B.R. 529, 534 (Bankr. E.D. Mich. 1987). Also, the requirements of court approval and a hearing after notice to interested parties provide necessary safeguards to parties forced to maintain contractual relations with a reorganizing debtor. *See id.* "It is extremely important that interested parties be notified and have an opportunity to appear with regard to whether or not a debtor is going to assume. . . ." *Typocraft*, 229 B.R. at 689 (dealing with the assumption of a collective bargaining agreement); *see Sea Harvest Corp. v. Riviera Land Co.*, 868 F.2d 1077, 1079 (9th Cir. 1989)("Thus, these rules plainly specify that a debtor in possession must file a formal motion and provide reasonable notice and an opportunity for a hearing to the opposing party.").

The theoretical underpinnings of these cases cannot logically be restricted to those instances involving assumption by motion. Notice as a procedural safeguard cannot expand or contract based solely upon the procedural choice of the debtor when the ramifications to the non-debtor party are no less severe. Not surprisingly, the limited number of courts that have explicitly addressed this issue adopt the same approach taken by the district court in *REPH*.

In *In re Flugel*, 197 B.R. 92 (Bankr. S.D. Cal. 1996), chapter 13 debtors provided for the assumption of a non-residential real estate lease in a special provision attached to their plan. *See* 197 B.R. at 94. Under this provision, debtors sought to assume the unexpired lease, cure the existing pre-petition default, and provide adequate assurance of future performance. *See id.* The *Flugel* court faced the question of whether the special assumption provision in the plan was adequate to satisfy the Bankruptcy Code's notice requirements. Discussing favorably the analysis of § 365 and Rule 6006 employed in *REPH*, the court held that notice was sufficient because the non-debtor party was served with a mailing "which included specific notice that the Debtors intended to assume the lease." *Id.* at 94-95. Once the non-debtor was served with the notice, it had an opportunity to determine whether it needed to contest the proposed cure provisions of the plan.

The *Flugel* court noted that the same analysis had also been

applied in *Riddle v. Aneiro (In re Aneiro)*, 72 B.R. 424 (Bankr. S.D. Cal. 1987). In that case, the court arrived at the same conclusion as the *REPH* and *Flugel* courts -- the debtor had a responsibility to assure that the non-debtor party to the contract or lease was on notice of the debtor's specific intent to assume the lease so as to be able to evaluate whether the assumption criteria were satisfactory. *See Aneiro*, 72 B.R. at 427. In *Aneiro*, the non-debtor received a copy of the chapter 13 debtor's plan which contained a provision explaining the assumption. In both *Aneiro* and *Flugel*, the courts were in part attempting to decide whether an assumption under a plan still required the filing of a motion. Clearly neither court would have been satisfied with mere "pendency of the action" notice since both contemplated that at a minimum the non-debtor would receive either the proposed plan or some form of notice setting forth the debtor's intent to assume. Ultimately, the *Aneiro* court held that the motion to assume was "made" when the non-debtor party to the lease was served notice of the plan's filing. *See* 72 B.R. at 428. The identical approach has been applied by other courts. *See, e.g.*, *In re Hall*, 202 B.R. 929, 932-33 (Bankr. W.D. Tenn. 1996)(notice requirements satisfied by delivery of notice with plan attached).

This result is the only course that is consistent with the notice analysis in cases involving rejection of a contract, in which a claim arises stemming from the rejection and the non-debtor

is then allowed to assert an unsecured claim for damages. *See, e.g., In re Parkwood Realty Corp.*, 157 B.R. 687 (W.D. Wash. 1993). In *Parkwood*, the court explained:

> These provisions read together clearly contemplate that a party to an executory contract will receive notice of rejection when it receives a copy of the Disclosure Statement and Plan, giving it a window in which to file a proof of claim for damages. A party which has not even had notice of the plan, let alone the debtor's intention to reject, is given no opportunity to file a claim. To hold that a claim has been discharged under these circumstances would clearly violate due process.

*In re Parkwood,* 157 B.R. at 690.

Accordingly, we hold that the debtor had responsibility to assure that the non-debtor party was on notice of the debtor's specific intent to assume the contract. Unless there is a showing that the non-debtor possessed actual knowledge of a sufficiently refined degree, the debtor must demonstrate delivery of the proposed plan of reorganization or some other court-ordered notice that set forth National Gypsum's intent to assume the Wellington Agreement with a $0 cure amount. With the proper standard now in mind, we turn to the facts of this case.

### 3.    *A Fact Question Exists as to Formal Notice*

National Gypsum asserts that Century received adequate formal notice because, as the summary judgement record shows, a number of notices were sent over the course of almost a year to attorney Lynn Bregman. Ms.  Bregman, who represented Century in a separate insurance case involving National Gypsum that took place in the Southern District of New York and was settled by June 1989, asserts

31

that neither she nor any other attorney at Wilmer, Cutler & Pickering was ever retained to represent Century in the National Gypsum bankruptcy proceedings. Bregman further states that a search of the firm's files failed to uncover any of the following notices or documents: (1) the Notice of Assumption and Assignment of Certain Executory Contracts and Unexpired Leases and Amount of Cure Payment, If Any, (2) the solicitation package (consisting of the solicitation letter, the Court's Order Approving Debtor's Disclosure Statement, a ballot and ballot instructions for the Debtor's Plan, and the statement of position regarding the Debtor's Plan, nor (3) a copy of the Plan itself. The import of these particular notices and documents is that they are the few crucial documents that set forth the requisite information concerning the assumption and cure amount that would have alerted Century of alleged error in cure amount. On the other hand, none of the numerous peripheral mailings whose receipt is not contested contained any material related to the assumption of the executory contract with a $0 cure amount.[11] Therefore, the bankruptcy court correctly recognized the existence of a fact issue regarding

---

[11] Neither of the lower courts truly ventured into the battle over whether Ms. Bregman was a proper representative upon which to serve notice in this litigation. Since Ms. Bregman's connection to this litigation was not central to the bankruptcy court's analysis, the record is somewhat deficient in that regard and therefore precludes a definitive ruling here. The record can be further developed on remand if it is determined that the critical notices were in fact sent to Century.

Century's receipt of pre-confirmation notice of National Gypsum's intent to assume the Wellington Agreement with a $0 cure amount.

National Gypsum also argues that Century had sufficient actual knowledge. The summary judgment proof does establish that Joseph Proko, Century's vice-president in charge of special asbestos matters, was aware that the National Gypsum reorganization had commenced in 1990. Through his work as Century's representative to the Asbestos Claims Facility, Proko received status reports on the Facility's activities which often reference ongoing developments in asbestos litigation. National Gypsum's summary judgment proof contains a group of status reports dated throughout 1991 that made brief mention of a dispute over whether the bankruptcy court would approve National Gypsum's continued participation in the Facility. The reports do not discuss any other aspect of the National Gypsum reorganization; specifically, there was no mention of bar dates, assumption of the Wellington Agreement, default status on interest, deadlines for objections, discussion of the solicitation package, or the plan. Accordingly, the summary judgment record does not reflect that Century was sufficiently aware of National Gypsum's intent to assume with a $0 cure.

In conclusion, the bankruptcy court ordered National Gypsum to provide notice, pursuant to the requirements of the Bankruptcy Code and Bankruptcy Rules, of its specific intent to assume the Wellington Agreement. If such notice was not given, then the

33

bankruptcy court erred in permitting National Gypsum to assume the Wellington Agreement with a $0 cure amount.

Our holding on the notice issue obviates the need to resolve the disagreement below concerning the proper interpretation of the bankruptcy court's retention of jurisdiction language. Since *res judicata* can not operate to bar Century's claim if notice was inadequate, summary judgment in favor of National Gypsum was inappropriate.

### III. CONCLUSION

For the reasons set forth above, We AFFIRM the district court's decision.